[Civ. No. 46023. Second Dist., Div. Five. Nov. 13, 1975.]

THE REGENTS OF THE UNIVERSITY OF NEW
MEXICO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES
COUNTY, Respondent;
TERRY SANDERS et al., Real Parties in Interest.

---

**COUNSEL**

Rich & Ezer and Mitchel J. Ezer for Petitioner.

Evelle J. Younger, Attorney General, Warren J. Abbott, Assistant Attorney General, and Hadassa K. Gilbert, Deputy Attorney General, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Miller, Glassman & Browning and Anthony Michael Glassman for Real Parties in Interest.

## OPINION

**KAUS, P. J.**—Terry Sanders, cross-complainant below and real party here, a cinematographer, has a dispute with the Tamarind Lithography Workshop, Inc. ("Workshop"), a California nonprofit corporation, cross-defendant below, involving credits to a motion picture, apparently a documentary film about lithography.

In December 1974, Sanders filed an amended cross-complaint seeking various types of relief in connection with the film; he named petitioner, the Regents of the University of New Mexico, as a cross-defendant along with the Workshop.

The cross-complaint explains the genesis of Sanders' grievances against the Workshop in some detail. There is no hint that petitioner is directly or indirectly involved in their many disagreements. The basis for involving petitioner in the litigation at all is an allegation—on information and belief—that starting in 1970 the Workshop transferred to petitioner "without any consideration" all of its assets, including "all right, title and interest" to the film.[1]

Petitioner was served by mail. It then noticed a motion to quash service of process on it, supported by uncontroverted declarations and attachments, to show that it was not amenable to personal jurisdiction in California.[2]

### FACTS

In about 1960, the Ford Foundation gave the first of four grants to the Workshop in Los Angeles. The purpose of the grants was to aid in the

[1]Moreover, Sanders' present claims with respect to the film do not derive from his original dealings with the Workshop, but from an abortive written settlement of their differences in April 1973. Sanders does not spell out the precise legal theory on which the alleged transfer of the Workshop's assets to petitioner subjects the latter to liability for the Workshop's wrong. Obviously, however, what he has in mind is that petitioner is a transferee in fraud of the Workshop's creditors. (See Civ. Code, § 3439 et seq.; see also *Malone v. Red Top Cab Co.*, 16 Cal.App.2d 268, 271-274 [60 P.2d 543].)

[2]Although Sanders had the burden of proving personal jurisdiction (e.g., *Arnesen v. Raymond Lee Organization, Inc.*, 31 Cal.App.3d 991, 994-995 [107 Cal.Rptr. 744]), he apparently hoped that petitioner would talk its way into court. His opposition is limited to documentation that a New York film distributor had included the picture in its catalogue and named itself and the New Mexico Tamarind Institute as its source. Most of petitioner's alleged contacts with California consist of clearly unauthorized activities of that distributor. They may safely be ignored. Even Sanders, whose submissions are prone to hyperbole, cannot bring himself to refer to the distributor other than as petitioner's "ostensible" agent.

revival of the art of lithography. One of the parties in the action below, June Wayne, had formed the Workshop. Petitioner, University of New Mexico, eventually got involved in the activities that led to this case because Wayne and Clinton Adams, Dean of the School of Fine Arts at the University of New Mexico since 1961, were both interested in lithography. Adams had co-authored a book on the subject under Workshop sponsorship.

In April 1970, the Ford Foundation approved a "terminal" five-year grant to the Workshop. The terms of that grant are significant. June Wayne, on behalf of the Workshop, was informed that the grant was "for the phasing out of a program of national development in the art of lithography and the establishment of an institute at the University of New Mexico." The grant totalled $705,000 "of which $308,000 is to be used for the phasing out activities of the Tamarind Lithography Workshop and $397,000 is to be used to establish and support the Tamarind Institute at the University of New Mexico." The grant letter stated that "no deviations will be made therefrom without the Foundation's prior approval in writing," that the payment of grant funds to the Institute by the Workshop would be contingent upon "an annual review by the Workshop of the technical standards and administrative and financial position of the Institute," that any grant funds "not approved by the Workshop for payment to the Institute will not be retained by the Workshop but will be returned to the Foundation." It was the Foundation's understanding that petitioner had made a commitment of $38,000 in matching funds. If the phasing out activities of the Workshop were completed before the expiration of the grant, all unexpended grant funds "will be returned to the Foundation . . . ." Also, the grant would be terminated and "grant funds will be returned to the Foundation if these funds are not expended or committed for the purposes of the grant and within the period stated." The grant letter also included requirements of annual narrative and financial reports as a condition of receiving payments. A copy of the grant letter was sent to Dean Adams; a specific budget was attached.

The university and the Workshop then made a letter agreement under the terms of the Ford Foundation grant, for the purpose of establishing a Tamarind Institute (Institute) "within the College of Fine Arts of the University." Petitioner agreed that all grant funds made available to the Institute by the Workshop "must be expended or committed for the purpose of the grant." Petitioner committed itself to first-year matching funds of about $38,000 and agreed that the Institute would submit annual narrative and fund accounting reports to the Workshop.

If it turned out that it was not worthwhile to continue the Institute, grant funds would be returned to the Workshop, university funds would be returned to the university and funds from the sale of lithographs or contract printing would be divided between the Workshop and the university in proportion to their financial contributions.[3] After July 1, 1975, the Institute would be under the aegis of petitioner university and the Workshop would have no further responsibility for the Institute.

The Institute was apparently a success. In May 1974, in anticipation of the expiration of the five-year Ford Foundation grant, the Workshop and the university entered into an agreement under which two—of nine—impressions of each lithograph created at the Workshop during the years from 1960 to 1970 and owned by the Workshop were transferred to petitioner.

In short, all the extensive documentation before us contradicts Sanders' allegation that all of the Workshop's assets were transferred to the Institute.

Meantime, in April 1974, the Workshop sent the Institute three prints of the film at issue in this case as a gift, and the Institute then purchased from an independent source about a dozen more prints of the film. The Workshop then gave the Institute permission to distribute, sell or rent the prints. The Institute then entered into negotiations with a New York distributor for the distribution of the film. These were broken off as soon as Adams learned "that an attempt might be made to bring the University into the 'film litigation' (i.e., this suit) which was then pending . . . in California."[4]

The Institute's use of its prints of the film has been minimal: the film was loaned for exhibition at an art gallery in Houston, Texas, and at an art film center in New York City. It was also shown—without compensation—by Institute personnel in connection with one or two lectures at California universities.

The trial court denied petitioner's motion for an order quashing service of process on it.

---

[3]Sanders underscores this provision. However, the event—termination of the New Mexico Institute—did not occur. Moreover, Sanders ignores the provision that unexpended Ford Foundation funds were to be returned to the Ford Foundation.

[4]Dean Adams declares: The lawsuit "was of tremendous concern to the Institute, as it had had absolutely nothing to do with the production of the film nor with the assignment of credits therefor; and we most definitely did not want to expend any of Institute's limited resources in fighting a lawsuit over a problem to which the University had in no way, either actively or passively, contributed."

## DISCUSSION

Sanders concedes that petitioner is not amenable to suit in California with respect to causes of action having no relation to petitioner's activities here. (*Fisher Governor Co. v. Superior Court,* 53 Cal.2d 222, 225 [1 Cal.Rptr. 1, 347 P.2d 1].) He asserts, however, that this dispute involves petitioner's activities in this state, and suggests two bases for jurisdiction: (1) "merger" with the Workshop, and (2) sufficient forum-related activity of petitioner in connection with the cause of action on which the cross-complaint against it is based. (*Buckeye Boiler Co. v. Superior Court,* 71 Cal.2d 893, 898-899 [80 Cal.Rptr. 113, 458 P.2d 57].) There is much conceptual overlap between the two theories. In any event, considered separately or together, neither has merit.

*The Merger Theory.*

Sanders asserts that the agreements described above show that the Workshop has been either merged with or consolidated into the Institute, now part of petitioner university. He relies on Corporations Code section 4116, which provides, in substance, that the surviving or consolidated corporation assumes all the debts and liabilities of the constituent corporations, including pending legal actions.[5]

The facts do not support this theory; the provisions governing merger and consolidation do not apply to the relationship of the Workshop and the Institute. The record shows no merger or consolidation. To the contrary, the pending action by and against the Workshop indicates its continued existence.[6] In any event, although we know that the Ford Foundation in 1970 issued a terminal grant "for the phasing out of a program of national development in the art of the lithograph" at the Workshop, we know nothing about the Workshop's other assets or sources of income or funding. Finally, the June 1974 agreement between petitioner and the Workshop, relied on by real party, contradicts his assertion that a merger has occurred: Although the Workshop owned nine sets of each lithograph impression created there, only two sets were given to petitioner. No other assets were transferred under the 1974 agreement. In particular, there is no evidence that the negative of the film or any of the Workshop's many other rights relating to it were transferred. (See generally Nimmer on Copyright, §§ 109.1-109.13.) In

---

[5]Sanders does not explain why it would necessarily follow that petitioner has subjected itself to California in personam jurisdiction for Workshop's liabilities.

[6]Real party alleges that the Workshop's founder, June Wayne, is the *alter ego* of the Workshop.

brief, petitioner did not assume the Workshop's alleged liability to real party.

Although not explicitly argued, it appears that Sanders has attempted to squeeze the Institute—petitioner—and the Workshop into the matrix supplied by *Empire Steel Corp.* v. *Superior Court,* 56 Cal.2d 823 [17 Cal.Rptr. 150, 366 P.2d 502]. There, a Texas corporation was held to be doing business in California, based on its manipulation of a wholly owned and controlled subsidiary which it first created, and then drained of all assets, thereby defrauding California creditors. (56 Cal.2d at pp. 827-828, 831-833; see also, *Sheard* v. *Superior Court,* 40 Cal.App.3d 207, 210 [114 Cal.Rptr. 743].) The relationship between the Institute and the Workshop simply will not fit the pattern of a foreign corporation pulling the strings of a California puppet.[7]

If anything, the relationship was the reverse, but even the Workshop was no independent entrepreneur. It was the recipient and the subgrantor[8] of Ford Foundation funds. It participated in the creation of the Institute within the terms of the Foundation grant as agent or trustee of the Foundation. True, the Institute was accountable to the Workshop, but under the terms of the grant, the Workshop was, in turn, accountable to the Ford Foundation. The Workshop did not decide to set up a "branch" in or shift its operations to New Mexico. Rather, the Ford Foundation decided that an institute ought to be created at the University and provided the Workshop with resources to aid in its

---

[7]Special appearances are not proper occasions for testing the legal or factual merits of a complaint. (*Nelson* v. *Horvath,* 4 Cal.App.3d 1, 4-5 [84 Cal.Rptr. 101].) Nevertheless, when in personam jurisdiction is claimed on the basis of a foreign defendant's alleged forum-related activities in connection with the cause of action pleaded, facts relevant to the question of jurisdiction often bear upon the basic merits of the complaint. We assume that if a foreign corporation knowingly permits itself to be used as an instrument for defrauding California creditors, "traditional notions of fair play and substantial justice," as applied in *Empire Steel,* require no further forum-related activity to make that corporation amenable to suit in California courts. However, the record made ·by petitioner on the motion to quash destroys—incidentally, but effectively—the very basis of Sanders' cause of action against it. When in personam jurisdiction depends on the validity of the substantive claim against the foreign defendant and that defendant's showing on the motion to quash negatives ·the existence of that claim and plaintiff does not even support it by a prima facie showing, he cannot demand that we judge the question of jurisdiction in the light of a claim he apparently does not have. In stating that plaintiff has not even made a prima facie showing that there is any substantive merit to his case, we are not unmindful of the rule that the verified cross-complaint must be considered as an affidavit opposing the motion to quash. (*Arnesen* v. *Raymond Lee Organization, Inc., supra,* 31 Cal.App.3d 991, 995.) This rule, however, does not aid Sanders, who—as noted in the text—makes all the key allegations against petitioner on information and belief.·(*Sheard* v. *Superior Court, supra,* 40 Cal.App.3d 207, 212.)

[8]Indeed, even Sanders characterizes the 1970 Workshop-Institute agreement as a "subgrant."

establishment. The Workshop was, in essence, a trustee of Ford Foundation funds with respect to petitioner's Institute.

■ "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (*Hanson* v. *Denckla* (1958) 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1298, 78 S.Ct. 1228]; see *Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d 893, 900-903.)

Petitioner engaged in no such purposeful activity in California. It accepted a gift from the Ford Foundation which, for a time, was administered by the Workshop. It contributed funds and resources of its own. That the gift was sent from California should no more subject the Institute to California jurisdiction than if the Ford Foundation had instructed a California bank to mail checks.

*Forum-Related Activity.*

■ Sanders claims, as noted, that the record reveals sufficient forum-related contacts between petitioner and California with respect to the cause of action asserted against petitioner, to make it appropriate for California to assert in personam jurisdiction over petitioner. In connection with this argument, too, it is well to reemphasize that the cause of action asserted against petitioner does not arise out of any dispute between Sanders and petitioner. It is, rather, petitioner's alleged ownership of Workshop's assets which has triggered its involvement in the Sanders-Workshop controversy.

Claiming adequate contacts with California, Sanders attempts to squeeze more out of the record than its contents justify. Much of what he brings up is totally irrelevant. (See fn. 2, *ante.*) Much rests on a disingenuous confusion between Dean Adams' individual activities as an artist interested in lithography and his virtually nonexistent activities in California on behalf of petitioner.[9]

---

[9]Sanders has moved to augment the record with two documents not before the respondent court. One is a printed brochure published by the Institute which lists the subject film as available for purchase or rental. However, a red ink stamp "NOT YET AVAILABLE" destroys Sanders' point. He also wants us to consider a brochure issued by the Workshop in 1969 which lists Dean Adams as a "Program Consultant" and as a member of the Workshop's "Panel of Selection." This is entirely consistent with Dean Adams' evidence summarized in the opinion. The motion to augment is denied.

The only California "contact" which even remotely relates to the disputes contained in the cross-complaint is the incidental showing of the film by Institute personnel at California universities on "one or two" occasions. We need not consider what significance, if any, this contact would have if Sanders asserted a dispute with petitioner arising directly out of dealings relating to the film between himself and petitioner. That, however,—as we have stressed and restressed—is not the case. As far as the complaint is concerned, petitioner's involvement in the litigation derives solely from its alleged receipt of all of the assets of the Workshop.[10] Viewed in that light, the one or two showings of the film in this state cannot conceivably take on the aspect of a forum-related activity relating to the pending dispute between the parties. Because of the peculiar nature of the cause of action asserted against petitioner, no useful purpose would be served in matching this less than minimal contact against forum-related activities found insufficient in other cases, considered in light of the particular causes of action there involved. Suffice it to say that if the many cases discussed and dissected by petitioner[11] are good law, this is an a fortiorari case.

In summary: The record shows nothing except that petitioner, a foreign nonprofit corporation, has accepted a Ford Foundation grant conveyed to it through the Workshop as the Foundation's intermediary, and that on one or two occasions an infinitesimal part of the assets thus conveyed was brought into and used in California. To force the recipient of the grant to dissipate its resources in defending an action based on the alleged wrongdoing of persons over which it has no control, is not likely to encourage interstate charitable funding. We hold that due process—the litmus we must examine—forbids it.

The writ is granted as prayed.

Stephens, J., and Hastings, J., concurred.

A petition for a rehearing was denied December 8, 1975.

---

[10]To be precise: Sanders does not claim that petitioner in some fashion specifically assumed the Workshop's alleged obligation to give him credit on the motion picture. (See, e.g., *Fanning* v. *Yoland Productions, Inc.*, 150 Cal.App.2d 444, 448 [310 P.2d 85].)

[11]*Cornell University Medical College* v. *Superior Court*, 38 Cal.App.3d 311, 315-316 [113 Cal.Rptr. 291]; *Watson's Quality Turkey Products, Inc.* v. *Superior Court*, 37 Cal.App.3d 360, 364-366 [112 Cal.Rptr. 345]; *Interdyne Co.* v. *SYS Computer Corp.*, 31 Cal.App.3d 508, 510-511 [107 Cal.Rptr. 499]; *Arnesen* v. *Raymond Lee Organization, Inc.*, *supra*, 31 Cal.App.3d 991, 997-998; *Belmont Industries, Inc.* v. *Superior Court*, 31 Cal.App.3d 281, 286-289 [107 Cal.Rptr. 237]; *Vibration Isolation Products, Inc.* v. *American Nat. Rubber Co.*, 23 Cal.App.3d 480, 484 [100 Cal.Rptr. 269]; *Tiffany Records, Inc.* v. *M. B. Krupp Distributors, Inc.*, 276 Cal.App.2d 610, 615-621 [81 Cal.Rptr. 320].)