[No. B129319. Second Dist., Div. Seven. June 8, 1999.]

JEWISH DEFENSE ORGANIZATION, INC., et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; STEVEN RAMBAM, Real Party in Interest.

**COUNSEL**

R. Samuel Paz and Sonia M. Mercado for Petitioners.

No appearance for Respondent.

Sherman & Kurtz and Gary Kurtz for Real Party in Interest.

**OPINION**

**LILLIE, P. J.**—By this petition for writ of mandate, defendants in a defamation action seek to vacate the trial court's order of January 25, 1999, denying their motion to quash service of summons for lack of jurisdiction over them, or in the alternative, to stay or dismiss the action on the ground of forum non conveniens. The principal issue for review is whether California can properly assert jurisdiction over nonresident defendants based on

their contract with several Internet service providers with offices in California to operate World Wide Web sites from New York; defendants' Web site allegedly contained defamatory statements about plaintiff.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 1997, plaintiff Steven Rambam filed an unverified complaint against Jewish Defense Organization, Inc. (JDO) and Mordechai Levy (Levy) for defamation and related causes of action, alleging that in 1997 and continuing to the present time, JDO and Levy posted a World Wide Web page containing defamatory statements about Rambam, including the statements that Rambam is a government informant and a "snitch"; Rambam is a dangerous psychopath who tried to kill his mother; Rambam kidnapped people but was never charged by the police; Rambam secretly admires the Nazis and hates Jews; and Rambam is an anti-Semite who has been known to entrap Jews with no prior criminal record into committing crimes.

Levy and JDO filed a motion to quash service of summons or in the alternative a motion to stay or dismiss the action as brought in an inconvenient forum. The declarations and exhibits offered in support of, or in opposition to, the motions reveal the following.

Levy has been a resident of New York City since about 1985 and earns his living as an accountant. He conducts no commercial activities in California and owns no property in California; the last time Levy came to California was in 1989, for the purpose of making a public speech on an issue of public concern; between 1984 and 1989, Levy would come to California from time to time to make public speeches.

Levy lived in California from 1982 to 1984, when he was an undergraduate college student at California State University at Los Angeles; at some time in the early 1980's, Levy was associated with the Los Angeles chapter of a militant Jewish activist organization, the Jewish Defense League (JDL), headed by Irving Rubin. According to plaintiff, Levy was kicked out of the JDL "for refusing to accept organizational discipline"; according to Levy, he left the JDL voluntarily in 1981, and formed his own group in Los Angeles, known as the JDO. In the early 1980's Barry Krugel participated in the JDO in Los Angeles; according to Krugel, the JDO "had meetings, conducted self-defense education classes, prepared political literature, participated in and conducted demonstrations, [and] wrote articles." After Levy left Los Angeles in 1984, there was no longer any presence by JDO in Los Angeles. When Levy and the JDO left California, JDO no longer maintained any California telephone number or post office box. There is currently no

California chapter of the JDO; since the JDO left California in 1984, Krugel has not been in any way associated with JDO.

According to Levy, the JDO, an organization dedicated to fighting anti-Semitism, has been operating in New York City since 1985; the JDO conducts no commercial activities or services anywhere, and its only operation is to disseminate information concerning the status of Jewish affairs. Levy incorporated JDO in New York in 1989. The JDO maintains a World Wide Web site for the dissemination of information to anyone in the world where the Internet is available; the Web site is "passive," in that the JDO does not seek to attract readers or others to the site and does not capture or receive any information from those who may "hit" its Web site; the Web site "merely provides information for those people who seek access to it"; as far as Levy can ascertain, the only reaction from California with respect to the Web site has been the instant lawsuit. To set up JDO's Internet Web site, JDO established its domain names with Network Solutions, Inc., which apparently has offices in Virginia; all of JDO's negotiations and activities with Network Solutions were conducted by JDO in New York; one of the domain names registered by JDO was "RAMBAM-STEVE.COM." JDO's administrative and billing contact for the Web sites is listed on the Network Solutions contracts as Alan J. Weberman, a New York resident; Levy declared that Weberman is not an officer, employee, or agent of JDO and is not authorized to speak on behalf of JDO.

From 1988 to the present, Rambam was the president of a licensed private investigative agency, Pallorium, Inc., located in Brooklyn, New York; in 1989, Rambam was employed by Jan Tucker, a California licensed investigator, to locate and serve process on Levy in New York on behalf of Irving Rubin of the JDL, who was suing Levy for libel in a California court; in August 1989, while Rambam and Rubin were on a public street in front of Levy's New York residence, Levy opened fire on them, missed them, but wounded an innocent bystander; Levy was allegedly convicted of assault with a deadly weapon and sentenced to prison. Rubin's libel action against Levy was dismissed.

In the aftermath of Rubin's libel action, and in 1991, a lawyer, Mark Schapiro, sued Levy and Bertram Zweibon, seeking about $9,500 in contract damages; in 1993, Schapiro obtained a judgment of about $11,000 against Levy and Zweibon; Zweibon was allegedly the attorney who represented Levy in his criminal trial involving his shooting at Rambam and Rubin. Levy declared that although a judgment was entered against him in the Schapiro suit, he was never served with the Schapiro suit, did not appear, and did not know of its existence until plaintiff mentioned it in the instant lawsuit.

Sometime prior to the time Rambam filed the instant lawsuit against Levy and JDO, Rambam had filed in California a similar defamation lawsuit against the JDL and Rubin arising out of an allegedly defamatory Web page; during the discovery stage of the JDL action, Krugel contacted Levy in New York about the lawsuit; in 1997, after Rambam filed the instant lawsuit against Levy, Levy sent him (Krugel) some documents purporting to be about Rambam, which documents Krugel then passed on to Rubin to use in defense of Rambam's lawsuit. Krugel also testified in deposition that sometime in about 1997 a woman telephoned him about a speaking engagement by Levy in Orange County, but Krugel had no personal information about whether Levy came to Orange County; Levy denied coming to California at any time after 1989.

After Rambam filed the instant lawsuit against Levy and the JDO, defamatory information about Rambam similar to that on the JDO Web sites allegedly appeared on several "mirror" Web pages served by providers Xoom, Inc., Geocities, Inc., and Whowhere? Inc., located in California. According to Rambam, Levy and JDO are associated with the "mirror" Web sites served by the California providers because the JDO Web site admits that "we have established these mirror sites so that Rambam will have to sue many Internet providers." The documents from the "mirror" Web sites, however, reveal that the "mirror" Web sites in California were maintained by Alan Weberman, who Levy asserts is not an employee, officer or agent of JDO and is not authorized to speak on behalf of JDO.

Rambam engaged in a public records investigation about Levy, and asserts that Mordechai Levy owns real property in Los Angeles County, maintains post office box No. 25764 in Los Angeles, operates a service station known as Motty's Arco in Anaheim, owes the Franchise Tax Board about $13,000 in taxes, and participated in other California lawsuits as a plaintiff and defendant. Levy provided a declaration stating that his own investigation revealed that there is a person known as Mordechai Motty Levy, a native of Maryland, who moved to North Hollywood in 1992, and then moved to Los Angeles in 1995, and maintains post office box No. 25764, along with an Andrina Levy, probably his wife. Levy declared that he is not Mordechai Motty Levy, that a Social Security number associated with Motty Levy is not his Social Security number, and that Rambam was deliberately confusing Motty Levy with him; he has never heard of this other Levy who is in no way connected with him. Levy also denied that he is married and denied that he or the JDO invoked the benefits or protection of California law.

In opposition to the motions, Rambam supplied, inter alia, a declaration by California private investigator Jan Tucker which stated that "Beginning in

the early 1980's I have had contacts, associations, and business relationships with the [JDL] and the [JDO], and the leaders of both organizations. My relationship to the [JDO] of Mordechai Levy has always been adversarial in nature . . . ." Without any supporting details, Tucker states that "Since its inception, and through today, the JDO has always had a presence in the Los Angeles area," and that "Barry Krugel is and for many years has been the leader of the JDO's Chapter in Los Angeles." Tucker then alleged various activities of the Los Angeles chapter of the JDO, without providing any dates for the alleged activities, and in some instances failing to name the people allegedly taking the actions on behalf of JDO. Some of the incidents allegedly involved only Krugel and/or others; other incidents, such as Levy's alleged expulsion from the JDL and his distributing leaflets with the JDO symbol at a temple in the Sepulveda Pass, clearly related back to the early 1980's when Levy lived in Los Angeles. Tucker also declared that "Levy has at all times maintained post office boxes at various locations in Los Angeles County. I am informed and believe and thereon allege that he currently maintains U.S. Postal Service Post Office Box 25764 . . . ."

On December 12, 1997, the court granted Rambam's application to continue Levy and JDO's motions to quash service of summons or in the alternative to stay or dismiss the action, in order for plaintiff to conduct discovery on the jurisdictional issues. The minute order also recited that "The court determines that the forum non conveniens issue should be determined after resolution of the personal jurisdictional issue."

After hearing on the motions on November 4, 1998, the court took the matters under submission. By minute order of January 25, 1999, the court issued the following ruling: "Motion to Quash Service of Summons, or in the alternative, to Stay or Dismiss this Action by [Levy and JDO] initially heard on November 4, 1998, is denied." We infer from the minute order that the trial court denied both the motion to quash service of summons for lack of personal jurisdiction over the defendants and the alternative motion to stay or dismiss the action on the ground of forum non conveniens. Levy and JDO filed timely petition for writ of mandate challenging the denial of both motions.

I

STANDARD OF REVIEW

██ "California's long-arm statute authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California. (Code Civ. Proc., § 410.10.)

A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' (*International Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057] . . . .)" (*Vons Companies, Inc.* v. *Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444-445 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) "Personal jurisdiction may be either general or specific. A nonresident defendant may be subject to the general jurisdiction of the forum if his or her contacts in the forum state are 'substantial . . . continuous and systematic.' [Citations.] In such a case, 'it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum.' [Citations.]" (*Id.* at p. 445, italics omitted.)

 "If the nonresident defendant does not have substantial and systematic contacts in the forum sufficient to establish general jurisdiction, he or she still may be subject to the *specific* jurisdiction of the forum, if the defendant has purposefully availed himself or herself of forum benefits [citation], and the 'controversy is related to or "arises out of" a defendant's contacts with the forum.' [Citations.]" (*Vons Companies, Inc.* v. *Seabest Foods, Inc., supra,* 14 Cal.4th at p. 446.) "Finally, in analyzing the exercise of specific jurisdiction, '[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." ' [Citation.] Courts may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies." ' " (*Id.* at pp. 447-448.) Thus, specific jurisdiction is determined under a three-part test: "(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable." (*Panavision Intern., L.P.* v. *Toeppen* (9th Cir. 1998) 141 F.3d 1316, 1320 [applying California law].)

 "When a nonresident defendant challenges personal jurisdiction the burden shifts to the plaintiff to demonstrate by a preponderance of the

evidence that all necessary jurisdictional criteria are met. [Citation.] This burden must be met by competent evidence in affidavits and authenticated documentary evidence. An unverified complaint may not be considered as an affidavit supplying necessary facts." (*Ziller Electronics Lab GmbH* v. *Superior Court* (1988) 206 Cal.App.3d 1222, 1232-1233 [254 Cal.Rptr. 410].) Declarations are insufficient to support the assertions for which they are offered if they consist primarily of vague assertions of ultimate facts rather than specific evidentiary facts permitting a court to form an independent conclusion on the issue. (*Id.* at p. 1233.) Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable. (*Vons Companies, Inc.* v. *Seabest Foods, Inc., supra,* 14 Cal.4th 434, 449.) Where there is no conflict in the evidence, the question of personal jurisdiction is one of law; in such a case, the lower court's determination is not binding on the reviewing court. (*Hall* v. *LaRonde* (1997) 56 Cal.App.4th 1342, 1346 [66 Cal.Rptr.2d 399].)

II

### INSUFFICIENT EVIDENCE TO SUPPORT GENERAL JURISDICTION

██ Rambam's contention that the evidence is sufficient to establish general jurisdiction over Levy and the JDO is based on the assertion that the trial court was required to accept as true Rambam's evidence offered to support the claims that Levy and the JDO have continuous and systematic contacts with California in that the JDO, allegedly Levy's alter ego, has always maintained a Los Angeles post office box, that the JDO maintains a chapter in Los Angeles, that Levy has used California courts twice as a plaintiff since the late 1980's, and that Levy entered into contracts with three California-based Internet service providers to publish at least seven defamatory Web pages. Rambam argues in his return to the petition for writ of mandate that "The trial court was required to presume the truth of the evidence presented by Rambam, and to resolve the conflicting evidence in Rambam's favor. This court is required to resolve evidence disputes in favor of the trial court's ruling. . . . As there were no rulings on defendants' evidence objections, they should be presumed to have been denied."

We agree with petitioners that the declarations offered by Rambam in opposition to the motions, particularly that of Tucker, fail to support the assertions set out therein pertaining to the JDO's alleged presence and activities in California after 1984 as a matter of law. On the latter issues, Tucker's and Rambam's declarations lack foundation, contain conclusory

and vague statements, and are inadequate to support the legal and factual conclusions for which they are offered.

Even though our record contains no express rulings by the trial court on defendants' evidentiary objections, we infer from the record of the hearing on the motions that the trial court rejected Rambam's assertions of JDO's and Levy's presence in California, and the claim of general jurisdiction; rather, the trial court clearly deemed the dispositive issue to be whether specific jurisdiction was established here based on the location of the Internet server in California. At one point, the trial court remarked that "But the facts here are that the [Internet] provider was here," and "We are sort of riding in an area of new law. There is no question about that." Thus, we infer from the instant record that the trial court disregarded the conclusions in Tucker's declaration and agreed with Levy's explanation that Levy and the JDO no longer had any presence in California and that the JDO, after 1984, did not maintain any chapter in California; rather, the public records revealing a post office box, lawsuits, tax liens, and property owned by a "Mordechai Levy" referred to a person other than petitioner. Thus, the trial court properly rejected the theory of general jurisdiction and Rambam's assertion that Levy and the JDO maintained substantial, continuous and systematic contacts with California sufficient to establish a "presence" in California.

Even if the instant ruling could be construed to be based on a finding of general jurisdiction, we would conclude that such a finding is not supported by the evidence. No reasonable person could conclude on this record that the Mordechai Levy who heads the JDO and has lived for over a decade in New York is that Mordechai Levy who runs an Arco service station in Anaheim, maintains a Los Angeles post office box, and was recently a plaintiff in California lawsuits. On the instant record, no reasonable person could interpret any of the declarations as supporting the claim that after Levy and the JDO left California in the 1980's, Barry Krugel was an agent of the JDO and/or Levy and acted on their behalf. Nor was there sufficient evidence to establish that Alan Weberman, in allegedly establishing several "mirror" Web sites using California Internet service providers, was acting as an agent or employee of JDO and/or Levy.　　" 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " (*Regents of University of New Mexico v. Superior Court* (1975) 52 Cal.App.3d 964, 971 [125 Cal.Rptr. 413].)

■ Accordingly, the instant record permits the conclusion that defendants' only contacts with California after 1989 consisted of (1) the use of the mail to send some documents to Krugel in California in connection with another libel lawsuit by Rambam against Rubin, and (2) contracting with one or more Internet service providers who happen to be located in California, so as to permit them to operate a passive Web site from their residence in New York.[1] Even Rambam does not contend that the foregoing conduct alone is sufficient to provide a basis for the assertion of general jurisdiction over defendants in California, and provides no authorities or argument to support such proposition. We thus conclude that there was an insufficient basis for the assertion of general jurisdiction over defendants. We proceed to address the issue of whether defendants' conduct is sufficient to establish specific jurisdiction.

### III

### INSUFFICIENT EVIDENCE TO SUPPORT SPECIFIC JURISDICTION

We first address the issue of specific jurisdiction in the context of the case law which has developed in defamation cases, and then in the context of the case law which is developing in the area of the use of the Internet.

■ In tort cases, the "purposeful availment" requirement for specific jurisdiction can be satisfied by the "effects test," set out in *Calder* v. *Jones* (1984) 465 U.S. 783 [104 S.Ct. 1482, 79 L.Ed.2d 804]. (*Panavision Intern., L.P.* v. *Toeppen, supra,* 141 F.3d 1316, 1321.) "Under *Calder,* personal jurisdiction can be based upon: '(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state.'" (141 F.3d at p. 1321.)

---

[1] In their points and authorities supporting the petition for writ of mandate, Levy and JDO admit that they employed Internet servers such as Network Solutions, Inc., located in Virginia, Geocities, Inc., a Delaware corporation located in California, and Xoom, Inc., located in California and New York. Petitioners maintain, however, that it is those servers who are present in California as independent contractors; petitioners are not present in California, and their contracting with the Internet servers was for the purpose of providing greater access to people all over the world via the Internet, and not to target California and New York. Petitioners argue: "California and New York are the hubs for world wide Internet dissemination. Contractors there were chosen not to target New York and California but because those states are leaders in the technology involved. Engaging an Internet server is as simple as a few keystrokes while sitting at one's computer . . . . . If the [court] found personal jurisdiction, based on the happenstance of the physical location of the Internet server, every complaint arising out of the alleged tort on the Internet would automatically result in personal jurisdiction wherever the Internet server is located. That would not comport with traditional notions of what qualifies as purposeful activity invoking the benefits and protections of the forum state." (Italics omitted.)

In ascertaining the existence of specific jurisdiction, ". . . we consider only those 'forum-related activities as they relate to the specific cause of action.' "[2] (*Gordy* v. *Daily News, L.P.* (9th Cir. 1996) 95 F.3d 829, 835.) Thus, ". . . the question is whether the quality and nature of petitioners' forum-related activity in relation to [the] complaint is sufficient to permit California to exercise jurisdiction over them. [Citations.] To prevail, [plaintiff] must establish the causes of action arose out of an act committed or transaction consummated in California, or that petitioners performed some other act by which they purposefully availed themselves of the . . . benefits and protections of the state's laws." (*Mansour* v. *Superior Court* (1995) 38 Cal.App.4th 1750, 1758-1759 [46 Cal.Rptr.2d 191].) "While [defendants] may have foreseen the allegedly defamatory statements might be published in California, that alone is not enough to subject them to personal jurisdiction in this state." (*Id.* at p. 1759.)

" 'In a libel case, however, we do not think the likelihood that an offending publication will enter a forum is a fair measure of the reasonableness of the exercise of jurisdiction over a publisher. The nature of the press is such that copies of most major newspapers will be located throughout the world, and we do not think it consistent with fairness to subject publishers to personal jurisdiction solely because an insignificant number of copies of their newspapers were circulated in the forum state. In a defamation case, therefore, the appropriate jurisdictional analysis should be to determine whether or not it was foreseeable that a risk of injury by defamation would arise in the forum state.' " (*Evangelize China Fellowship, Inc.* v. *Evangelize China Fellowship* (1983) 146 Cal.App.3d 440, 447 [194 Cal.Rptr. 240].)

"It is reasonable to expect the bulk of the harm from defamation of an individual to be felt at his domicile." (*Gordy* v. *Daily News, L.P.*, *supra*, 95 F.3d at p. 833.) In *Core-Vent Corp.* v. *Nobel Industries AB* (9th Cir. 1993) 11 F.3d 1482, the Ninth Circuit held "that publication of a commercial libel in a worldwide medical journal did not permit suit against Swedish writers in California. Our primary ground for so ruling was that it would have been unreasonable for the writers to be required to be sued in California, . . . but we also expressed doubt that the defamation was truly targeted at California when the purported target was a corporation that did a worldwide business. 'A corporation does not suffer harm in a particular geographic location in the same sense that an individual does.' " (*Gordy* v. *Daily News, L.P.*, *supra*, 95 F.3d at p. 833.)

---

[2]Accordingly, for purposes of specific jurisdiction, we ignore the fact that Levy may have used the mail to mail some documents to Krugel in California for use in another lawsuit by Rambam; there is no evidence establishing that such documents were defamatory or that the documents relate to the instant lawsuit in any way.

On the instant record, we conclude that Rambam failed to provide sufficient evidence to establish that it was foreseeable that a risk of injury by defamation would arise in California. Rambam went to great lengths to state that New York is not his "full time" residence. Yet, Rambam did not identify any other place of residence; he stated that he traveled most of the time, including Europe, Israel, and the Far East; as to California, he stated only that he spends "considerable professional time" in California. However, Rambam failed to establish he had any clients in California, or that the alleged defamatory statements herein would impact a business interest or reputation in California. In *Panavision Intern., L.P.* v. *Toeppen, supra*, 141 F.3d at page 1316, the court held that when a nonresident defendant engaged in a scheme to register Panavision's trademarks as his domain names and posted a Web site on the Internet for the purpose of extorting money from Panavision, the "purposeful availment" requirement for specific jurisdiction over defendant was satisfied under the "effects test"; although Panavision was a Delaware limited partnership, its principal place of business was in California, and defendant's conduct, as he knew it likely would, had the effect of injuring Panavision in California; thus, the brunt of the harm suffered by Panavision was in the state where it maintained its principal place of business. (*Id.* at p. 1322.)

There is an insufficient basis in this record to conclude that California is Rambam's principal place of business, or that the alleged defamation was targeted at California or would cause the brunt of the harm in California.[3] Accordingly, there is insufficient evidence showing defendants' minimum contacts with California under the analysis set out in cases dealing with defamation by nonresidents. As is explained below, we reach the same result under the analysis in cases dealing with the use of the Internet.

"The Internet is a worldwide network of computers that enables various individuals and organizations to share information. The Internet allows

[3]The court in *IMO Industries, Inc.* v. *Kiekert AG* (3d Cir. 1998) 155 F.3d 254 agreed "with the conclusion reached by the First, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that jurisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum. . . . [ Rather] the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity. Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement. The defendant must 'manifest behavior intentionally targeted at and focused on' the forum for *Calder* to be satisfied." (155 F.3d at p. 265, italics and fn. omitted.)

In the instant case, we need not resolve any conflict among the federal circuits; Rambam has not even established that his residence or principal place of business is in California, so the purposeful availment prong of the special jurisdiction issue is not satisfied on that ground.

computer users to access millions of web sites and web pages. A web page is a computer data file that can include names, words, messages, pictures, sounds, and links to other information. [¶] Every web page has its own web site, which is its address, similar to a telephone number or street address." (*Panavision Intern., L.P.* v. *Toeppen, supra,* 141 F.3d at p. 1318.)

"The Internet makes it possible to conduct business throughout the world entirely from a desktop. With this global revolution looming on the horizon, the development of the law concerning the permissible scope of personal jurisdiction based on Internet use is in its infant stages. The cases are scant. Nevertheless, our review of the available cases and materials reveals that the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. ▉ If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. [Citation.] At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. [Citation.] The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." (*Zippo Mfg. Co.* v. *Zippo Dot Com, Inc.* (W.D.Pa. 1997) 952 F.Supp. 1119, 1123-1124, fn. omitted.)

▉ In the instant case, defendants' conduct in registering Rambam's name as a domain name and posting passive Web sites on the Internet is not sufficient to subject them to jurisdiction in California.[4] (*Panavision Intern., L.P.* v. *Toeppen, supra,* 141 F.3d at p. 1322.) ▉ " 'Creating a site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed toward the forum state.' [(*Bensusan Restaurant Corp.* v. *King* (S.D.N.Y.

---

[4]Rambam's return questions Levy's characterization of the Web sites as "passive," claiming that Levy's declaration is self-serving and that "we do not even know what that means." Rambam also asserts, without citation of any authority, that expert evidence is needed to establish the Web sites as passive or interactive. Such challenges are without merit, as Levy's declarations explain in detail the nature of the Web sites, which meet the definition of passive Web sites set out in the *Zippo Mfg. Co.* case.

1996) 937 F.Supp. 295, 301, citing the plurality opinion in *Asahi Metal Indus. Co. v. Superior Court* (1987) 480 U.S. 102, 112, [107 S.Ct. 1026, 1032, 94 L.Ed.2d 92].)]" (*Cybersell, Inc. v. Cybersell, Inc.* (9th Cir. 1997) 130 F.3d 414, 418.)

In *Pres-Kap v. System One, Direct Access* (Fla.Dist.Ct.App. 1994) 636 So.2d 1351, ". . . a majority of a three-judge intermediate state appeals court refused to exercise jurisdiction over a consumer of an on-line airline ticketing service. *Pres-Kap* involved a suit on a contract dispute in a Florida court by a Delaware corporation against its New York customer. [Citation.] The defendant had leased computer equipment which it used to access an airline ticketing computer located in Florida. [Citation.] The contract was solicited, negotiated, executed and serviced in New York. [Citation.] The defendant's only contact with Florida consisted of logging onto the computer located in Florida and mailing payments for the leased equipment to Florida. . . . [*Pres-Kap*] addressed the exercise of jurisdiction over a consumer of on-line services as opposed to a seller. When a consumer logs onto a server in a foreign jurisdiction he is engaging in a fundamentally different type of contact than an entity that is using the Internet to sell or market products or services to residents of foreign jurisdictions. The *Pres-Kap* court specifically expressed concern over the implications of subjecting users of 'on-line' services with contracts with out-of-state networks to suit in foreign jurisdictions." (*Zippo Mfg. Co. v. Zippo Dot Com, Inc., supra*, 952 F.Supp. at p. 1125.)

The court in *Pres-Kap* identified its concerns as follows: "Across the nation, in every state, customers of 'on-line' computer information networks have contractual [relationships] with out-of-state supplier companies, putting such customers in a situation similar, if not identical, to the defendant in the instant case. Lawyers, journalists, teachers, physicians, courts, universities, and business people throughout the country daily conduct various types of computer-assisted research over telephone lines linked to supplier databases located in other states. Based on the trial court's decision below, users of such 'on-line' services could be haled into court in the state in which supplier's billing office and database happen to be located, even if such users, as here, are solicited, engaged, and serviced entirely instate by the supplier's local representatives. Such a result, in our view, is wildly beyond the reasonable expectations of such computer-information users, and, accordingly, the result offends traditional notions of fair play and substantial justice. [Citations.]" (*Pres-Kap v. System One, Direct Access, supra*, 636 So.2d at p. 1353, fn. omitted.)

In the instant case, defendants were mere customers of Internet service providers that happen to maintain offices or databases in California;

such providers were engaged by JDO from its computer in New York. As in *Pres-Kap*, we conclude that defendants' conduct of contracting, via computer, with Internet service providers, which may be California corporations or which may maintain offices or databases in California, is insufficient to constitute "purposeful availment" and does not satisfy the first prong of the three-part test for specific jurisdiction. In light of our conclusion, we need not address the other prongs of the test for specific jurisdiction, or the motion to stay or dismiss on grounds of inconvenient forum.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its order of January 25, 1999, and to enter a new and different order granting petitioners' motion to quash service of summons. Petitioners are entitled to costs on review.

Johnson, J., and Woods, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied September 15, 1999.