[No. B136005. Second Dist., Div. One. Nov. 2, 2000.]

THOMAS E. MALONE, Plaintiff and Appellant, v.
EQUITAS REINSURANCE LIMITED et al., Defendants and
Respondents.

CYRIL LUCAS, Plaintiff and Appellant, v.
EQUITAS REINSURANCE LIMITED et al., Defendants and
Respondents.

**COUNSEL**

Baker, Keener & Nahra, Robert C. Baker, Daniel Patrick Leonard and R. Jeffrey Neer for Plaintiffs and Appellants.

Hancock Rothert & Bunshoft, Barry L. Bunshoft, Deborah A. Pitts and Jennifer A. Vane for Defendants and Respondents.

## OPINION

**MALLANO, J.**—This case is just one of many in which individual underwriters at Lloyd's of London have sued English entities in the United States based on events that occurred in England. The trial court dismissed the action for lack of personal jurisdiction. We conclude that defendants did not have the requisite contacts with the State of California and affirm.

### BACKGROUND

Lloyd's of London, though not an insurance company itself, provides a marketplace for insurance underwriters. Underwriters at Lloyd's, including plaintiffs, are known as "Names." They combine in "syndicates" to underwrite insurance. Each Name has a percentage share in the syndicates of which he or she is a member.

The underwriting capacity of each syndicate is supplied by the funds advanced by the Names. Excess losses—those that exceed the premiums paid—are covered by the Names' commitment to pay losses from their personal assets. As a condition of membership at Lloyd's, the Names execute a "General Undertaking" by which they acknowledge their unlimited financial commitment to cover losses.

Faced with the possibility of unlimited liability, many Names procure personal stop-loss policies, which essentially reinsure the underwriting losses for which a Name may become liable. In November 1989 and September 1990, respectively, plaintiffs Thomas E. Malone and Cyril Lucas purchased stop-loss policies through Holman Wade, a London broker. The policies were underwritten by defendant Syndicate 872 and provided coverage up to specified limits.

During the late 1980's and early 1990's, unanticipated losses from asbestosis and pollution claims, together with a string of catastrophic events such as Hurricane Hugo and the bombing of Pan Am Flight No. 103, caused losses far greater than the premiums paid, causing a significant financial burden on the Names. As losses mounted, intramarket disputes arose.

To restore the integrity of the London insurance market, Lloyd's developed a "Reconstruction and Renewal Plan" by which a newly formed company, defendant Equitas Reinsurance Limited, would reinsure the Names for their pre-1993 non-life underwriting obligations. In exchange for the reinsurance, Equitas would charge the Names a premium that was based on each Name's proportionate share of the pre-1993 reserves and losses

incurred by the syndicates in which they were members. If the plan was approved by a majority of Names, even the dissenting Names would be assessed premiums as authorized by their commitment to Lloyd's in the General Undertaking.

Ninety-four percent of the Names approved the plan. Plaintiffs were among the 6 percent who dissented and refused to pay premiums to Equitas. Under the terms of a "Reinsurance and Run-Off Contract," if a dissenting Name refused to pay the required premium, Equitas could use the proceeds from that Name's stop-loss policy to offset the premium owed for the reinsurance. Equitas's right to assess a premium on the dissenting Names and, by implication, its right to the benefits under their stop-loss policies, was approved by the English Court of Appeal, Civil Division in *Society of Lloyd's v. Leighs* (QBCMI 97/0644/B July 31, 1997).[1]

On March 9, 1998, Malone filed this action against Syndicate 872 and Equitas in Los Angeles County Superior Court (No. BC187236). On April 1, 1998, Lucas filed a similar action in San Diego County Superior Court (case No. 719419), which was subsequently transferred to Los Angeles County Superior Court (case No. BC205803). By order dated March 30, 1999, the two cases were deemed related and were assigned for all purposes to Judge Kurt J. Lewin.

In May 1999, plaintiffs separately filed amended complaints, alleging that they had received notice from Lloyd's that their underwriting losses had exceeded the limits of their stop-loss policies. Plaintiffs alleged that they were entitled to payment under the policies. They further alleged that Syndicate 872, together with Equitas, had "taken the position that it is not obligated to pay said claim because it had a right to a set off greater than the amount owed to Plaintiff pursuant to an agreement to which Plaintiff was not a party[, i.e., the Reinsurance and Run-Off Contract]." At all pertinent times, plaintiffs were residents of California.

On July 9, 1999, defendants filed separate motions to quash service of summons for lack of personal jurisdiction. Plaintiffs filed opposition. The trial court heard argument on August 9, 1999, and took the matter under submission. By order dated September 20, 1999, the trial court granted the motions. Plaintiffs filed a timely appeal.

### DISCUSSION

When a defendant moves the trial court to quash service of summons for lack of personal jurisdiction, the plaintiff has the initial burden of

---

[1]This decicion can be found at www.casetrack.com/casebase.

proving that sufficient contacts exist between the defendant and California to justify the exercise of personal jurisdiction. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) If that burden is met, the burden shifts to the defendant to demonstrate that the assumption of jurisdiction would be unreasonable. (*Ibid.*) Where the evidence of jurisdictional facts is not in conflict, we independently review the trial court's decision. (*Great-West Life Assurance Co. v. Guarantee Co. of North America* (1988) 205 Cal.App.3d 199, 204 [252 Cal.Rptr. 363].) To the extent there are conflicts in the evidence, we must resolve them in favor of the prevailing party and the trial court's order. (*Floyd J. Harkness Co. v. Amezcua* (1976) 60 Cal.App.3d 687, 689 [131 Cal.Rptr. 667].)

"California's 'long-arm' statute extends the jurisdiction of California courts to the outermost boundaries of due process. 'A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.' " (*Rocklin De Mexico, S. A. v. Superior Court* (1984) 157 Cal.App.3d 91, 94 [203 Cal.Rptr. 547].) "[T]he forum state may not exercise jurisdiction over a nonresident unless the relationship of that person or entity to the state is such as to make the exercise of such jurisdiction reasonable." (*Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, 716 [46 Cal.Rptr.2d 888].)[2]

As the United States Supreme Court explained in *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462 [105 S.Ct. 2174, 85 L.Ed.2d 528]: "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' . . . By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,' . . . the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit,' . . . . [¶] . . . [¶]

"[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State. . . . In defining

[2] Personal jurisdiction is of two types: general and specific. General jurisdiction exists when the activities of a nonresident in the forum state are substantial, continuous, and systematic, or extensive and wide-ranging. (*Boaz v. Boyle & Co., supra,* 40 Cal.App.4th at p. 717.) In such circumstances, it is not necessary that the cause of action be related to the defendant's forum activities. (*Ibid.*) In contrast, under specific jurisdiction, the lawsuit must arise out of, or be related to, the defendant's contacts with the forum. (*Id.* at pp. 716-717.) In the present case, plaintiffs do not contend that California had general jurisdiction over defendants.

when it is that a potential defendant should 'reasonably anticipate' out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson v. Denckla*, 357 U. S. 235, 253 [78 S.Ct. 1228, 1239-1240, 2 L.Ed.2d 1283] (1958): 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of the 'unilateral activity of another party or a third person,' . . . . ■ Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State. . . . Thus where the defendant 'deliberately' has engaged in significant activities within a State, . . . or has created 'continuing obligations' between himself and residents of the forum, . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (*Burger King Corp. v. Rudzewicz, supra*, 471 U.S. at pp. 471-476 [105 S.Ct. at pp. 2181-2184], citations, fns. & original italics omitted.)[3]

■ In moving to quash service of summons, Syndicate 872 submitted a declaration from its former chief underwriter, who stated: (1) the syndicate was formed in 1982, with its registered office located at 10 Crosswall, London, England, and its principal place of business at 1 Lime Street, London, England; (2) the syndicate was organized under the laws of England as an unincorporated association of Names; (3) the syndicate authorized

---

[3]"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' . . . Thus courts in 'appropriate case[s]' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' " (*Burger King, supra*, 471 U.S. at pp. 476-477 [105 S.Ct. at p. 2181], citation omitted.) Because we conclude that defendants lacked the requisite minimum contacts with California, we do not reach the question of whether jurisdiction over them would comport with fair play and substantial justice. (See *Felix v. Bomoro Kommanditgesellschaft* (1987) 196 Cal.App.3d 106, 117 [241 Cal.Rptr. 670, 69 A.L.R.4th 1].)

Holman Wade, a London broker, to issue stop-loss policies that would indemnify the Names for losses they incurred while acting as underwriters in the London insurance market; (4) in accordance with the custom and practice at Lloyd's, plaintiffs, through their agents, negotiated and procured stop-loss policies from Holman Wade in London, England; and (5) the syndicate ceased writing insurance in 1993.

The declaration also set forth the usual litany of "no contacts" with the forum state: Syndicate 872 was never qualified to do business in California, never maintained an office, post office box, or telephone listing in California, never owned or leased any real or personal property in California, never advertised in California, never paid or was assessed taxes or franchise fees in California, never commenced a legal action in California, and never agreed —whether by contract, appointment of agents, or otherwise—to submit to the jurisdiction of California.

Similarly, Equitas submitted a declaration from its corporate secretary, stating: (1) Equitas is a private limited company organized under the laws of England and was incorporated on December 5, 1995; (2) Equitas's registered and principal place of business is 33 St. Mary Axe, London, England; (3) Equitas does not have any place of business outside England; (4) all of the company's officers, directors, shareholders, and employees reside in England; (5) pursuant to the Reinsurance and Run-Off Contract, Equitas agreed to reinsure the pre-1993 non-life liabilities, losses, and claims of the Names; (6) the reinsurance contract was negotiated, executed, and was to be performed in England; (7) Equitas was funded in part by premiums to be paid by the Names based on their proportionate share of the pre-1993 liabilities of the syndicates in which they participated; and (8) under the reinsurance contract, Equitas had the right to offset those premiums with the benefits available under a Name's stop-loss policy. Finally, like Syndicate 872, Equitas denied any contacts with California.

In opposing the motion to quash, Malone submitted a declaration, stating: (1) Syndicate 872 had solicited him to buy stop-loss insurance (as reflected in various correspondence); (2) on November 24, 1989, he purchased stop-loss coverage from the syndicate through Holman Wade, a syndicate agent; (3) the insurance policy was executed, delivered, and renewed in Torrance, California; (4) premiums on the policy were paid from Malone's personal account in London; (5) the personal account was administered by an agent of the syndicate; (6) Malone incurred losses in the London insurance market and made several claims under the policy; (7) he received two payments, both sent to his Torrance address; and (8) on March 11, 1997, Equitas informed him by letter that his claims had been approved but Equitas would

not make any further payments to him, as permitted under the Reinsurance and Run-Off Contract.

For his part, Lucas submitted a declaration, stating: (1) Syndicate 872 had solicited him to purchase stop-loss insurance; (2) he purchased stop-loss coverage in January 1990 from the syndicate through Holman Wade, an agent of the syndicate; (3) the insurance policy was executed in England but was renewed on two occasions from Escondido, California; (4) after Lucas suffered losses in the London insurance market, he made several claims under the stop-loss policy; (5) on one claim, he received payment in California; and (6) on April 7, 1997, Equitas informed Lucas by letter that his claims had been approved but Equitas would not make any additional payments to him because the remaining proceeds would be used as an offset under the Reinsurance and Run-Off Contract.

Relying on *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220 [78 S.Ct. 199, 2 L.Ed.2d 223], plaintiffs assert that Syndicate 872 solicited them in California to buy stop-loss insurance. In *McGee*, an insurance company in Texas solicited a California resident by mail to buy life insurance. The resident purchased a policy and mailed the premiums from California to Texas for six years, until his death. When the insurer refused to pay on the policy, the beneficiary filed suit in California and prevailed. The Supreme Court found that personal jurisdiction existed because the insurer had solicited the insured in California, delivered the policy in California, and accepted premiums mailed from California. Further, the event that triggered the policy's benefits—the insured's death—occurred in California. (*Id.* at pp. 222-223 [78 S.Ct. at p. 201].) As the court held, "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with [the forum] State." (*Id.* at p. 223 [78 S.Ct. at p. 201.) Here, we cannot say that plaintiffs' stop-loss policies had a substantial connection with California.

For one thing, *McGee* is not as expansive as plaintiffs contend. "*McGee* does not hold that the simple fact that beneficiaries of an insurance policy issued by a foreign corporation reside in California is sufficient to establish personal jurisdiction over that corporation." (*In re Marriage of Martin* (1989) 207 Cal.App.3d 1426, 1435 [255 Cal.Rptr. 720].) "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at p. 478 [105 S.Ct. at p. 2185].)

Further, plaintiffs' reliance on the solicitation factor goes nowhere. The evidence on that point was in conflict. Defendants' evidence indicated that,

in accordance with "the custom and practice in the London insurance market, [plaintiffs], *through their agents*, negotiated and procured [stop-loss] policies from Holman Wade in London, England." (Italics added.) Given this conflict, we defer to the trial court's implied finding in favor of defendants. (See *Floyd J. Harkness Co. v. Amezcua, supra,* 60 Cal.App.3d at p. 689.)

That defendants did not solicit business in California strongly supports the view that personal jurisdiction was lacking. (See *Kulko v. California Superior Court* (1978) 436 U.S. 84, 97 [98 S.Ct. 1690, 1699, 56 L.Ed.2d 132] [no personal jurisdiction where nonresident defendant did not solicit business from plaintiff]; *Hanson v. Denckla, supra,* 357 U.S. at pp. 251-252 [78 S.Ct. at p. 1239] [no jurisdiction over nonresident who did not solicit business in forum state]; *Travelers Health Assn. v. Virginia* (1950) 339 U.S. 643 [70 S.Ct. 927, 94 L.Ed. 1154] [Virginia had jurisdiction over Nebraska mail-order health insurer who had solicited business in Virginia]; *Sher v. Johnson* (9th Cir. 1990) 911 F.2d 1357, 1363 [no jurisdiction over out-of-state law firm where firm "is solicited in its home state and takes no affirmative action to promote business within the forum state"].)[4]

■ Moreover, the Supreme Court has "emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' . . . It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at p. 479 [105 S.Ct. at p. 2184].)

■ In the present case, the purchase of stop-loss insurance was an intermediate step in plaintiffs' attempt to make a profit in the London insurance market. At the outset, they pledged their personal assets to back the underwriting risks of the Lloyd's market. They then purchased stop-loss insurance because of the possibility that, somewhere down the road, losses might exceed premiums. In short, plaintiffs obtained insurance through their agent in England to cover business risks in England. Correspondence from London to California—making some payments under the policy and denying others—does not constitute sufficient contacts. (See *Hunt v. Erie Ins. Group*

---

[4]Plaintiffs sometimes refer to Syndicate 872 as Lloyd's. The record suggests that the syndicate and Lloyd's were distinct entities. Regardless, we would reach the same result even if they were a single entity. On a similar note, plaintiffs argue that, under the Reinsurance and Run-Off Contract, Equitas "replaced" the syndicate and that all of the syndicate's contacts with California are imputed to Equitas. Even if true, that would not make a difference because we find that the syndicate's contacts were insufficient to support personal jurisdiction.

(9th Cir. 1984) 728 F.2d 1244, 1248.) We therefore conclude that neither of the defendants " 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " (*Burger King Corp. v. Rudzewicz, supra*, 471 U.S. at p. 475 [105 S.Ct. at p. 2183].)

Our conclusion finds support in a decision by the Colorado Court of Appeals. In *Union Pacific R. Co. v. Equitas Ltd.* (Colo.Ct.App. 1999) 987 P.2d 954, the appellate court agreed with the findings of the trial court, to wit: " 'Equitas Limited is a British company which has never done business in the State of Colorado, has no agents in the State of Colorado, owns no property in the State of Colorado, and has not solicited business in the State of Colorado. . . . The fact that some of the Names may be Colorado residents does not mean that Equitas Limited has purposely availed itself of the privilege of doing business in Colorado. . . . Therefore, the mere fact that Colorado Names entered into an agreement with Equitas Limited, does not in any way suggest that Equitas Limited has affirmatively taken advantage of doing business in Colorado. . . . The fact that the Reinsurance and Run-Off Contract makes it foreseeable that Equitas Limited would be hiring and directing lawyers in a Colorado lawsuit is insufficient. Such foreseeability . . . [alone, is not] a sufficient constitutional basis to give this Court personal jurisdiction over Equitas Limited.' " (*Id.* at p. 957.)[5]

In closing, we reject plaintiffs' argument that defendants waived their objection to personal jurisdiction by discussing the merits of the case in their motion to quash service of summons. "Special appearances are not proper occasions for testing the legal or factual merits of a complaint. [Citation.] Nevertheless, when in personam jurisdiction is claimed on the basis of a foreign defendant's alleged forum-related activities in connection with the cause of action pleaded, facts relevant to the question of jurisdiction often bear upon the basic merits of the complaint. . . . When in personam jurisdiction depends on the validity of the substantive claim against the foreign defendant[, it is to be expected that the] defendant's showing on the motion to quash negatives the existence of that claim . . . ." (*Regents of University of New Mexico v. Superior Court* (1975) 52 Cal.App.3d 964, 970, fn. 7 [125 Cal.Rptr. 413].)[6]

---

[5]Plaintiffs cite two superior court decisions—one from Maine and the other from New Jersey—that apparently found jurisdiction over Equitas. We decline to follow them.

[6]Plaintiffs contend that the Reinsurance and Run-Off Contract was not a "typical" indemnity insurance contract but was a reinsurance-to-close contract. On that issue, we agree with the Colorado Court of Appeals: "Plaintiff asserts that the contract here is a 'reinsurance to close' contract. However, we are not aware of any authority to support its assertion that this

## DISPOSITION

The order is affirmed.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

On November 27, 2000, the opinion was modified to read as printed above.

---

characterization is significant and relevant to our analysis." (*Union Pacific R. Co. v. Equitas Ltd.*, *supra*, 987 P.2d at p. 956.)