[No. D042633. Fourth Dist., Div. One. Mar. 17, 2004.]

WEST CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
PATRICIA SANFORD, Real Party in Interest.

## COUNSEL

Walsh & Furcolo, Timothy M. Twomey, Daniel W. Kelsberg; Bondurant, Mixson & Elmore, M. Jerome Elmore, Joshua F. Thorpe and Corey F. Hirokawa for Petitioners.

No appearance for Respondent.

Milberg Weiss Bershad Hynes & Lerach, Patrick J. Coughlin, Frank J. Janecek, Jr., Kevin K. Green; Law Office of Artie Baran and Artie Baran for Real Party in Interest.

## OPINION

**McCONNELL, P. J.**—Proceedings in mandate after superior court denied a motion to quash service of summons for lack of personal jurisdiction.

■ Petitioners West Corporation (West) and West Telemarketing Corporation (WTC) seek a writ of mandate directing the superior court to grant their motion to quash service of summons on the grounds of lack of personal jurisdiction. The issue presented is whether California may constitutionally assert jurisdiction over a nonresident telemarketing corporation when a California resident initiates a phone call to buy a product, reaches a telemarketer who handles the order, the telemarketer then initiates a sale of a separate product and allegedly makes misrepresentations during the sales pitch for the separate product. We conclude personal jurisdiction is proper.

### FACTUAL AND PROCEDURAL BACKGROUND

WTC is a wholly owned subsidiary of West. Both corporations are organized under the laws of the state of Delaware and have their headquarters

in Nebraska. Neither maintains any offices or employees in California, is licensed to do business in California, nor owns property in California.

WTC is an "inbound teleservices bureau." WTC answers telephone calls for 800 numbers and collects orders for various products and services on behalf of its clients. One of WTC's clients advertised and sold Tae-bo fitness tapes. Another one of WTC's clients was Memberworks, Inc. (MWI). MWI is incorporated under the laws of the state of Delaware and has its principal place of business in Connecticut.

In March 1998, WTC and MWI entered into a "Joint Marketing Agreement" to market MWI's membership programs and to share net profits and losses equally. In January 1999, WTC and MWI entered into a separate "Wholesale Agreement" providing that WTC, at its sole expense, would market, accept orders, and charge consumers for enrollment in the membership programs while MWI would mail out the memberships kits for a fee.

In January 1999, West accepted and assumed all of WTC's rights and obligations under the Joint Marketing and Wholesale Agreements. West used WTC to fulfill its contractual obligations. In July 1999, WTC, West, and MWI entered into a "Joint and Wholesale Marketing Agreement" which superseded and essentially consolidated the prior agreements into one contract.

In late February 1999, Patricia Sanford, a California resident, called an 800 number to order some Tae-bo fitness videotapes. A WTC operator located in Virginia answered the phone call. After the WTC operator processed Sanford's order for the Tae-bo tapes, including obtaining her credit card information, the operator proceeded to read a sales pitch from a prepared script for a purportedly free trial membership in a "buying club" that was serviced by MWI. This type of sales pitch for additional products or services is commonly called an "upsell." When Sanford "accepted" the MWI offer, WTC forwarded her information, including credit card information, to MWI. According to Sanford, she and other consumers are told to look for materials in the mail confirming the "risk-free" membership. Sanford alleged several weeks later her credit card was charged "an unsolicited and unexpected $72.00" for "MWI Essentials." In January 2000, she "was assessed another unsolicited and unexpected $84.00 charge . . . again charged as 'MWI Essentials.' " After inquiring about this charge, Sanford learned this was a renewal fee for the membership buying program. She was not informed that she had been enrolled in the program the prior year and she had never used it. Sanford requested and received a refund of the $84.00 renewal charge.

Sanford alleged that customers are not asked their permission to have their credit and/or debit card information given to MWI and are not sent a bill or

invoice indicating their credit/debit cards will be charged. She alleged customers are charged between $60 and $150 annually for membership or renewal fees for the MWI buying clubs.

Originally, Sanford filed her class action suit in federal court (*Sanford v. Memberworks, Inc.* (S.D. Cal., No. 02-CV-601 H (LSP)) alleging causes of action for a violation of federal laws regarding unordered merchandise, declaratory relief, conversion, unjust enrichment, and fraud. West and WTC unsuccessfully moved to dismiss Sanford's federal suit for lack of personal jurisdiction. However, Sanford's federal claim against West and WTC for the mailing of unordered merchandise was eventually dismissed because West and WTC had not been involved in mailing the membership kits to Sanford. The federal court declined to take supplemental jurisdiction over Sanford's state claims.

On February 13, 2003, Sanford filed a class action complaint in San Diego Superior Court against West and WTC alleging causes of action for: (1) violation of the consumers legal remedies act; (2) unlawful, fraudulent and unfair business practices; (3) untrue and/or misleading advertising; (4) conversion; (5) unjust enrichment; (6) fraud and deceit; and (7) negligent misrepresentation.

West and WTC unsuccessfully moved to quash service of summons on the ground the court lacked personal jurisdiction.

## DISCUSSION

West and WTC argue that personal jurisdiction was improperly asserted, pointing out they have no employees or offices in California, they are not licensed to do business in California, and they own no California property. They further point out they did not advertise the Tae-bo fitness videotapes or MWI memberships in California. Nor did they mail anything to or bill Sanford. They stress that Sanford initiated the telephone call that WTC answered in Virginia and assert they did not reach out to Sanford or any other California resident. Sanford focuses on the fact that the defendants initiated the upsell of the MWI membership program while knowing she was a California resident.

"A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) "A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that

the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 [58 Cal.Rptr.2d 899, 926 P.2d 1085].)

"Under the minimum contacts test, 'an essential criterion in all cases is whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him [or her] to conduct his [or her] defense in that State.' [Citations.] '[T]he "minimum contacts" test . . . is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.' [Citations.] '[T]his determination is one in which few answers will be written "in black and white. The greys are dominant and even among them the shades are innumerable." ' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 [127 Cal.Rptr.2d 329, 58 P.3d 2].)

Jurisdiction may be general when the nonresident's activities in the forum state are " 'extensive or wide-ranging' [citation] or 'substantial . . . continuous and systematic.' " (*Alexander v. Heater* (1987) 193 Cal.App.3d 1241, 1244 [238 Cal.Rptr. 795].) In such a situation, "there is a constitutionally sufficient relationship to warrant jurisdiction for all causes of action against him [or her], regardless of whether the specific cause of action is connected to the defendant's business activities in the forum." (*Ibid.*) Alternatively, jurisdiction may be specific, i.e., based "upon the nature and quality of the defendant's activities in the forum in relation to the particular cause of action, and the balance between the convenience of the parties and the interest of the state in asserting jurisdiction." (*Ibid.*) "When determining whether specific jurisdiction exists, courts consider the ' "relationship among the defendant, the forum, and the litigation." ' [Citations.] A court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum" ' [citations]; and (3) ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " ' " (*Pavlovich v. Superior Court, supra,* 29 Cal.4th 262, 269.)

"When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable. [Citation.] When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages

in an independent review of the record." (*Vons Companies, Inc. v. Seabest Foods, Inc., supra,* 14 Cal.4th 434, 449.)

### Purposeful Availment

The parties disagree as to whether the defendants purposefully availed themselves of the privilege of conducting business in California.

" 'The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his [or her] activities toward the forum so that he [or she] should expect, by virtue of the benefit he [or she] receives, to be subject to the court's jurisdiction based on' his [or her] contacts with the forum. [Citation.] Thus, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts [citations], or of the "unilateral activity of another party or a third person." ' " (*Pavlovich v. Superior Court, supra,* 29 Cal.4th 262, 269.)

The mere causing "of an effect in California is not necessarily sufficient to afford a constitutional basis for the extension of jurisdiction." (*Stanley Consultants, Inc. v. Superior Court* (1978) 77 Cal.App.3d 444, 448 [143 Cal.Rptr. 655].) Nor is it sufficient that it is foreseeable that a product would enter or cause injury in California for an assertion of jurisdiction over a foreign corporation. (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297–298 [62 L.Ed.2d 490, 100 S.Ct. 559] [New York car seller not subject to jurisdiction in California for a lawsuit by plaintiffs who while New York residents purchased a car in New York and were injured in a collision in Oklahoma on their way to their new home in Arizona]; see also *Farris v. Capt. J. B. Fronapfel Co.* (1986) 182 Cal.App.3d 982, 990 [227 Cal.Rptr. 619] [Florida marine surveyor not subject to jurisdiction in California for a lawsuit filed by a California resident involving survey of boat purchased and surveyed in Florida; "[t]he effects in California of [the] alleged intentional misrepresentation in Florida are too remote in time and causal connection to fairly and justly require [the nonresident defendant] to come to California to defend himself as a result of [the] Florida transaction"].)

" 'The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State' "; there must be additional conduct indicating " 'an intent or purpose to serve the market in the forum State . . . .' " (*Resolution Trust Corporation v. First of America Bank* (C.D.Cal. 1992) 796 F.Supp. 1333, 1336 (*Resolution Trust*) quoting from *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 112 [94 L.Ed.2d 92, 107 S.Ct. 1026].) Thus, the court in *Resolution*

*Trust* found that although a Michigan bank had participated in a national clearinghouse service which made it foreseeable that its services would be used in California, an assertion of jurisdiction was improper because "[o]ther than placing itself in the stream of commerce, the bank did no act to avail itself of California." (*Resolution Trust, supra,* at p. 1336.) The *Resolution Trust* court also found noteworthy the fact that the California bank had initiated the contact with the Michigan bank. (*Ibid.*) The court explained: "Participating in the national clearinghouse service seems analogous to having telephone service which allows people to call the bank from all parts of the country and world to perform banking transactions. Yet, such technology which makes banking services more accessible to customers does not commit the bank to national jurisdiction without some affirmative action to avail itself of a particular forum." (*Ibid.*)

Additional conduct supporting an assertion of jurisdiction includes marketing directed at residents of the forum state including by direct mail campaigns (*United States Golf Ass'n v. U.S. Amateur Golf Ass'n* (D.N.J. 1988) 690 F.Supp. 317, 320, 322 [New Jersey jurisdiction found over California partnership that mailed approximately 1,400 promotional packages to various locations in the United States, including 22 packages sent to New Jersey]); the Internet (*Colt Studio, Inc. v. Badpuppy Enterprise* (C.D.Cal. 1999) 75 F.Supp.2d 1104, 1110–1111 [California jurisdiction found over company operating Internet site selling subscriptions to "member-only" areas of its website]); or the telephone (*American Telephone & Telegraph Co. v. MCI Communications Corp.* (D.N.J. 1990) 736 F.Supp. 1294, 1304 (*AT&T*)). As explained in *Electro-Catheter Corp. v. Surgical Specialties Instrument Corp.* (D.N.J. 1984) 587 F.Supp. 1446, 1455: "While, in isolation, telephone and mail communications may not establish a substantial connection between a nonresident and a forum, when these communications form an integral part of an ongoing business relationship, such contacts are relevant in assessing the nature and extent of defendant's conduct within a forum. Otherwise, those businesses that can conduct extensive commercial activity in other jurisdictions primarily by telephone or through the mails would tend to be immunized from suit by those with whom they do business in any but their home jurisdictions."

In *AT&T, supra,* 736 F.Supp. 1294, MCI Communications Corporation (MCI) contracted with Pioneer TeleTechnologies, Inc. (Pioneer) to handle its telemarketing program. Pioneer was incorporated and had its principal place of business in Iowa. It did not have any offices or employees in New Jersey and was not licensed to do business in New Jersey. (*Id.* at p. 1298.) American Telephone & Telegraph Company (AT&T) sued MCI and Pioneer in New Jersey for allegedly wrongful conduct in making false or deceptive statements to AT&T customers and directing local companies to switch customers

without their consent. "During 1989, Pioneer made over seventy five million telephone calls for MCI, two percent of which—or approximately one and one-half million calls—were made to New Jersey residents. Pioneer has no relationship with New Jersey beyond the telemarketing calls made to New Jersey residents at the direction of MCI." (*Ibid.*) Pioneer sought dismissal of AT&T's claims against it on the basis New Jersey lacked jurisdiction.

The court concluded Pioneer had sufficient minimum contacts with the state of New Jersey and had purposefully availed itself of the privilege of conducting activities within New Jersey. (*AT&T, supra,* 736 F.Supp. 1294, 1302–1303.) The court rejected Pioneer's argument that "its contacts with New Jersey were relatively minor compared with the claims asserted by AT&T" because only 2 percent of the more than 75 million calls made by Pioneer had been to New Jersey residents, only a small selection of AT&T's sample of individuals allegedly victimized by misrepresentations or unauthorized telephone service switching had been "sold" by Pioneer, and because "the telephone calls were 'fortuitous' because it was MCI, not Pioneer, which determined what numbers would be called." (*Id.* at p. 1303.) The *AT&T* court stated:

"By comparing Pioneer's contacts with this state to the total number of telephone calls made on behalf of MCI, Pioneer turns the analysis away from the relevant issue. That issue is whether Pioneer purposefully availed itself of the privilege of doing business in this state. The simple fact of the matter is that Pioneer made approximately one and one-half million telephone calls to this state in an effort to solicit business for MCI. These contacts were made in the course of implementing a nationwide telemarketing campaign for MCI.

"That only two percent of the seventy five million calls made by Pioneer were made to New Jersey residents does not detract from the nature and quality of those contacts. The telemarketing efforts of Pioneer reached approximately one and one-half million New Jersey residences. The record indicates these calls involved a prolonged sales presentation in an effort to persuade New Jersey residents to adopt MCI as their long distance carrier. This lawsuit arises directly from those telecommunications. Although Pioneer may be subject to suit for misrepresentation in every state in which it conducted substantial telemarketing activities, '[i]t is realistically possible that a defendant corporation may have the required minimum jurisdictional contacts with all fifty states resulting from its business activities.' [Citation.]" (*AT&T, supra,* 736 F.Supp. 1294, 1303.)

The *AT&T* court noted that adopting Pioneer's arguments "would effectively immunize Pioneer from liability for misrepresentations arising out of its telecommunications in any state other than its home forum," a result to be

avoided. (*AT&T, supra,* 736 F.Supp. 1294, 1303–1304.) The court also noted that to the extent the telephone contacts benefited MCI, "they indirectly inured to the benefit of Pioneer." (*Id.* at p. 1304.) The court further analogized the telemarketing activities of MCI and Pioneer to a direct mail campaign, a situation where courts had found personal jurisdiction even when the number of promotional mailings to residents of a forum were relatively small in number. (*Ibid.,* citing *United States Golf Ass'n v. U.S. Amateur Golf Ass'n, supra,* 690 F.Supp. 317, 322 [where 22 of approximately 1,400 promotional packages were sent to New Jersey residents].)

Petitioners contend the *AT&T* case is distinguishable on the basis that the telemarketing company in that case initiated the calls to the residents of the forum state whereas here Sanford initiated the call. While it is true Sanford initiated the call, it is also true she only initiated a call for the purpose of purchasing the fitness videotapes, not for the purpose of inquiring about MWI membership programs. It was West, through its telemarketing agreement with WTC, who initiated the "upsell" of the MWI membership program. Treating an upsell as a separate transaction and as one initiated by the telemarketer is consistent with the view of the Federal Trade Commission: "*[I]n any upsell, the seller or telemarketer initiates the offer; it is not the consumer who solicits or requests the transaction.* This means that the consumer is hearing the terms of that upsell offer for the first time on the telephone. The consumer has not had an opportunity to review and consider the terms of the offer in a direct mail piece, or to view an advertisement and gather information on pricing or quality of the particular good or service before determining to make the purchase. *This makes an upsell very much akin to an outbound telephone call* from the consumer's perspective, even when the seller is someone with whom the consumer is familiar." (Federal Trade Com., *Telemarketing Sales Rules,* 68 Fed.Reg. 4580, 4597 (Jan. 29, 2003) (*FTC Telemarketing Sales Rules*), italics added.)

■ We agree with the Federal Trade Commission; an upsell is like an outbound telephone call and therefore this case is similar to the *AT&T* case. We conclude telemarketers who upsell a product to residents of a forum state have purposefully availed themselves of the privileges of conducting activities within the forum state.

Petitioners contend that the purposeful availment requirement cannot be met simply by showing the petitioners made a "solicitation" of Sanford. They argue: "[T]aken to its logical end, Sanford's position would mean that *any* comment or suggestion the WTC operator made to Sanford after Sanford placed her call would subject WTC to jurisdiction in California. Under Sanford's erroneous theory, for example, if the WTC operator had offered Sanford the option to purchase an additional TAE-Bo tape, had asked her

whether she preferred regular or expedited shipping on her TAE-Bo tapes, or had even made any positive comment concerning the TAE-Bo tapes in response to a question from Sanford, which could be construed as an encouragement to purchase the tapes, WTC could be subject to personal jurisdiction in California due to its supposed 'solicitation' of Sanford during the call she initiated."

This argument is specious. At issue here is a commercial transaction initiated by West and WTC. West, through WTC, intentionally aimed a sales pitch at a California resident; they did not merely "solicit" shipping information, inquire whether the Tae-bo order was complete or ask any additional questions about the order.

Petitioners also attempt to analogize their case to the situation of a Nebraska hotel owner who does not solicit business from California but who, after learning of his guests' California residence during check-in, provides the guests with an offer to receive a risk-free trial subscription to a magazine. This is an inapplicable analogy. In the petitioners' example, the entire transaction physically takes place in Nebraska and the only connection to California is by a stream-of-commerce theory. Here, in contrast, the transaction did not occur all in one state; Sanford was located in California, the WTC operator was located in Virginia, WTC and West were located in Nebraska, and MWI was located in Connecticut. Further, the petitioners were not mere hotel owners located in Nebraska with a sideline business; rather, their business involved commercial activity directed at residents of other states, including California.

### Relation to Petitioners' Contacts with Forum

To assert specific jurisdiction in California over a nonresident company it is necessary that the controversy relate to or arise out of the company's contacts with California. Petitioners assert West "had no contact whatsoever with Sanford," that "personal jurisdiction over West cannot be based on actions taken by WTC," and "personal jurisdiction over West and WTC cannot be based on actions taken by [MWI]." They argue Sanford erroneously attempts to support the jurisdiction claim "on the grounds that [petitioners] placed a product in the 'stream of commerce,' " and "improperly attempts to attribute [MWI]'s conduct to WTC." The petitioners rely on the fact "that only [MWI], not WTC, mailed anything to Plaintiff." Petitioners' argument is unpersuasive.

Sanford's complaint was not based only on the mailing or nonmailing of a membership kit or invoice, but on the allegedly deceptive marketing of the memberships, including the use of misleading and deceptive scripts. The

undisputed evidence shows a WTC operator read this allegedly misleading and deceptive script to Sanford. Pursuant to the March 1998 Joint Marketing Agreement between WTC and MWI, WTC's responsibilities included "[e]xpend[ing] management time as reasonably requested by [MWI] to improve scripting . . . ." Under the January 1, 1999 Wholesale Agreement between WTC and MWI, WTC was to propose "marketing materials (including but not limited to scripts)" to MWI for its approval, WTC was to accept orders, was "responsible for billing of Membership Fees and any renewals thereof," and was to pay MWI "on a monthly basis, compensation for Sales as set forth" in an attachment. On January 1, 1999, WTC and West entered into an assignment where WTC quitclaimed its interests in MWI agreements to West. Moreover, under the agreements, West as well as WTC financially benefited from the sales of MWI memberships.

This evidence shows that West, WTC, and MWI were involved in the sales of the membership products including developing the allegedly deceptive scripts and sharing in the profits and/or losses. The controversy here directly related to activity by West and WTC in their contact with Sanford.

█ In sum, since West and WTC purposefully availed themselves of the privilege of doing business in California and the transaction here directly related to the controversy at issue, we conclude minimum contacts existed for the assertion of specific personal jurisdiction.

*Fair Play and Substantial Justice*

█ Even if minimum contacts are present, an assertion of jurisdiction by California over a nonresident company is improper if it would not comport with fair play and substantial justice. (*Pavlovich v. Superior Court, supra,* 29 Cal.4th 262, 269.) Factors relevant to this determination include " ' "the burden on the defendant," "the forum State's interest in adjudicating the dispute," [and] "the plaintiff's interest in obtaining convenient and effective relief . . . ." ' " (*Malone v. Equitas Reinsurance, Ltd.* (2000) 84 Cal.App.4th 1430, 1437, fn. 3 [101 Cal.Rptr.2d 524].) █ The defendant bears the burden of presenting a "compelling case" showing that subjecting it to suit in California would be unreasonable. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 477 [85 L.Ed.2d 528, 105 S.Ct. 2174]; *Vons Companies, Inc. v. Seabest Foods, Inc., supra,* 14 Cal.4th 434, 476.)

Petitioners argue that imposition of personal jurisdiction would impose an "enormous and unjustified" burden. They argue: "the practical implication will be that every business in the country that engages in any type of transaction over the phone, via the Internet, by mail, or even in person with out-of-state residents would potentially be subject to suit in every jurisdiction

throughout the United States" "despite the defendant's complete lack of contact with the forum or of conduct aimed at the forum." They argue the burden "is particularly evident in the context of alleged class action lawsuits, in which plaintiff's counsel routinely resort to the tactic of filing multiple lawsuits, in multiple jurisdictions, with the hopes of achieving a nationwide class certification in one of them."

We find Petitioners' argument unpersuasive. Their argument is based on the faulty premise that they did not aim conduct at California and lacked minimum contacts with the state. Companies, such as West and WTC that deliberately engage in nationwide or multi-state commercial activities, whether by phone, via the Internet, by mail, or by sending agents into forum states should reasonably expect to be subject to suit in the states where they solicit business. As explained by the Supreme Court in *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. 286, 297: "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State."[1]

It is not unreasonable to hold telemarketers who engage in nationwide marketing subject to the potential of being sued in every state in the union, regardless of whether the telemarketer initiates the telephone call or engages in an upsell during a call initiated by a consumer. As the Federal Trade Commission recently noted, one study found that 40 percent of the 14 billion "inbound calls" to telemarketers made each year have an upsell associated with them and it has been estimated that upsells generate approximately $1.5 billion in sales annually. (*FTC Telemarketing Sales Rules, supra,* 68 Fed.Reg. 4580, 4597, fn. 183.) Further, it has been noted by "some industry commentators, [that] sellers can reduce costs associated with telemarketing by linking transactions together in a single call, and are more likely to make successful sales to consumers already predisposed to the transaction." (*Id.* at p. 4597, fn. omitted.) In other words, upselling is big business and companies have substantial financial incentives to engage in upsells whether the call is initiated by the consumer or the telemarketer. Those who engage in upselling, whether it is the company who provides the service or product or the

---

[1] See also cases involving the Internet, recognizing that companies may potentially be subject to jurisdiction in every state in the union when they have an interactive website or commercial site that accepts orders from across the country. (See, e.g., *Pavlovich v. Superior Court, supra,* 29 Cal.4th 262, 274; *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* (W.D.Pa. 1997) 952 F.Supp. 1119, 1124–1126; Exon, *A New Shoe Is Needed to Walk Through Cyberspace Jurisdiction* (2000) 11 Alb. L.J. Sci. & Tech. 1.)

company that telemarkets the product or service and thereby shares in the profits should not be insulated from lawsuits in the states of the consumers it targets.

■ "A defendant's burden in litigating in the forum is a factor in the assessment of reasonableness, but unless the 'inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.' " (*Panavision Int'l, L.P. v. Toeppen* (9th Cir. 1988) 141 F.3d 1316, 1323.) There exists a potentially significant burden on West and WTC to litigate in California; however, we note that at least WTC has facilities in more than one state (e.g., headquarters in Nebraska and a telemarketing facility in Virginia). Moreover, generally requiring a corporation to litigate in California does not represent an inconvenience so great as to deprive the corporation of due process. "As [one] court stated, ' "in this era of fax machines and discount air travel" requiring [a defendant] to litigate in California is not constitutionally unreasonable.' " (*Ibid.*; *Colt Studio, Inc. v. Badpuppy Enterprise, supra,* 75 F.Supp.2d 1104, 1110.)

California has an interest in providing a convenient forum for its residents who have been injured by telemarketing fraud committed by nonresident corporations; the state has a "legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1064 [80 Cal.Rptr.2d 828, 968 P.2d 539]; see also *Vons Companies, Inc. v. Seabest Foods, Inc., supra,* 14 Cal.4th 434, 447.) A "forum state . . . has an interest in opening its courts to residents seeking redress [citation], particularly when its courts are the only ones accessible to them as a practical matter." (*Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893, 899 [80 Cal.Rptr. 113, 458 P.2d 57].)

As a practical matter, because the amount at issue is small, a California court is the only one available to Sanford. If she were required to litigate in Virginia or Nebraska, she would essentially be denied an opportunity to seek redress. The due process clause must be applied flexibly so as to "ensur[e] that commercial actors are not effectively 'judgment proof' for the consequences of obligations they voluntarily assume in other States . . . ." (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. 462, 486.) We decline to apply the jurisdictional rules so as to immunize the petitioners for the consequences of their conduct aimed at California residents. Nor do we find the class action nature of the lawsuit to be a basis for finding that an assertion of jurisdiction would be unfair, since, given the small amount of the individual claims, a class action is the only practical approach for the consumer.

We conclude the petitioners have not made a compelling case; an assertion of personal jurisdiction by California would comport with fair play and substantial justice.

## DISPOSITION

The petition is denied. Costs are awarded to Sanford.

Benke, J., and Haller, J., concurred.

Petitioners' petition for review by the Supreme Court was denied June 16, 2004.