Filed 9/24/25  Wasilchen v. Chapman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| TARRA WASILCHEN, | C100739 |
| Plaintiff and Appellant, | (Super. Ct. No. FL2023-1311) |
| v. | |
| DAVID CHAPMAN, | |
| Defendant and Respondent. | |

Plaintiff Tarra Wasilchen sought a domestic violence restraining order (DVRO) against her husband, defendant David Chapman, who lives in North Carolina.[1]  David filed a motion to quash service for lack of personal jurisdiction.  The trial court granted the motion and dismissed the case.  Tarra appeals, arguing the trial court found David committed two acts of domestic violence in California, which is sufficient to subject him to jurisdiction in this state.  She also argues the trial court improperly decided the merits

---

[1]  Like the parties, we refer to Tarra and David by their first names and mean no disrespect.

1

of the request for the DVRO, rather than deciding only the merits of the personal jurisdiction issue. We disagree with both arguments. Instead, we find the trial court impliedly found David did not commit acts of domestic violence in California, and California thus lacked personal jurisdiction over him, and this finding is supported by substantial evidence. We thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Tarra and David were married in 2019 and had a daughter in 2022. At all relevant times, David lived in North Carolina, and he has never lived in California. During the marriage, Tarra was completing her medical residency in South Carolina, and she and David also had a "marital residence" in North Carolina. Prior to the marriage, Tarra had lived in California and her parents still lived there.

On October 23, 2023 (unless otherwise noted, all further dates are in 2023), Tarra filed a request for a DVRO against David in Yolo County Superior Court, seeking an order protecting both herself and their daughter. She also filed a request for child custody and visitation orders seeking sole legal and physical custody of their daughter and no visitation for David. In support of her request, she stated David had been arrested in North Carolina on October 4 for domestic violence against her, he had since been released from jail, and she and her daughter had left North Carolina and come to California because she feared for their safety. She also stated that on October 20, she received a letter from her life insurance company "about an inquiry into my coverage. I did not inquire about my coverage but I bel[ie]ve David did."[2] She identified one incident of domestic violence that occurred in California on September 24, while she and

---

[2] We note David was asked about the letter at the evidentiary hearing on the motion to quash. He testified that in August 2023, Tarra contacted her life insurance company after spending a night in the hospital due to complications following a tonsillectomy. David had informed her the policy only covered accidental death, and she called the company to confirm that and to ask about changing the policy.

2

David were visiting her parents, and she described the incident as follows: "David became enraged while packing up the RV because I could not help him," and he "began to call me names like 'f - - - - - g c - - t',[3] and 'lazy b - - - h' in front of our child and my family. My step dad was horrified by the verbal abuse I endured." She stated, "David has threatened to kill me in the past and we need this Restraining Order to keep us safe."

On October 24, the court issued a temporary restraining order and temporary child custody and visitation orders pending a hearing scheduled for November 14. The hearing was rescheduled several times because David had not been served.

In the meantime, Tarra returned to North Carolina on October 25. It was her "understanding" that the California orders were "not enforceable in North Carolina unless [David] was served." She did not immediately attempt to serve David. When asked why, she explained she was trying to maintain "the status quo" because she was "afraid that if David found out what was happening, he could go into a rage" and "hurt me." Tarra returned to California on November 8 (and it appears she has remained here since then).

David was served in North Carolina on December 27. The next month, he filed a motion to quash for lack of personal jurisdiction. In support of the motion, he submitted a declaration stating he lived in North Carolina and his only contacts with California were for vacations and to visit Tarra's parents. He also stated, "There was a domestic dispute between my wife and me on October 4, 2023, at our marital residence in . . . North Carolina, and I was arrested. That matter is currently being adjudicated in . . . North Carolina . . . . All evidence regarding that incident is in North Carolina."[4]

---

**3** We choose to redact the parties' language throughout this opinion

**4** In addition to filing this appeal, Tarra also sought a writ of mandate directing the superior court to vacate its order granting the motion to quash. (*Wasilchen v. Superior Court*, case No. C101053.) In a declaration filed in support of her petition, Tarra stated all charges against David were dropped on or around March 26, 2024.

3

Tarra submitted a declaration in opposition to the motion. In it, she described two incidents of domestic violence that occurred at her parents' house in California on September 24,[5] and one incident that occurred the next day as they were driving from California to Florida. We will describe all three incidents in more detail below.

A two-day evidentiary hearing on the motion was held in March 2024. Our summary of the hearing focuses on the evidence that is directly relevant to this appeal.[6]

Tarra testified that she, David, and their daughter were in California in August and September of 2023 visiting her parents. On September 24, two incidents occurred at her parents' house. The first incident occurred in the morning. She and David had woken up late and were still in bed, and their daughter was in a pack-and-play in their bedroom. Tarra "wanted to know about the infidelities I had recently found out about a few days prior. [¶] I was trying to ask him about those, and he seemed calm. So I felt like . . . it was maybe safe to talk about them." Tarra asked him about some "videos" she had found, and he "started getting pretty agitated" and "screamed something like, 'You stupid, dumb c - - t.' " Their daughter was awake by that point, and Tarra got out of bed and followed David out of the room, and, "he started calling me more names, and it was just a crescendo, and it was like a pin got pulled." She asked him to lower his voice because her parents were in the house but he "just kept . . . getting louder." Tarra was "mortified" because she did not want her parents "to know we were having problems."

---

[5]     As noted above, in her initial request for a DVRO, she described only one such incident.

[6]     For example, there was much testimony about the incident in North Carolina that led to David's arrest for domestic violence and the aftermath of that incident (although we note David's testimony about the incident was limited because criminal charges were currently pending against him and "he has a Fifth Amendment right"). Because the issue here is whether David had sufficient contacts with California to support the exercise of jurisdiction over him, we do not describe that testimony.

"He kept screaming names, and then he kind of turned around" and "started coming towards me pretty quickly, and I don't remember . . . what he was doing with his hands. I just was looking at his face, and I saw his eyes were getting pretty wide, and he was coming at me fast." On cross-examination she testified he "clench[ed] his fists, but I was focused more on his face because his face was . . . very scary to me." Her stepfather "popped around the corner," and Tarra told him, "It's just a disagreement." David then "deflated, and he turned and he apologized to [her stepfather], and that was it."

The second incident occurred later that afternoon. Tarra and her daughter went outside and David was packing the RV. Tarra asked if there was anything she could do, and David said, "You could start loading the stuff." She said she "really shouldn't" because she had recently had surgery and was not supposed to lift more than 10 pounds, and David called her a "f - - - - - g lazy b - - - h." She then asked him not to put the suitcases underneath the RV because they would be difficult to get to, and "[a]t that point, he lost it" and "started throwing the suitcases out" and "screaming at me and . . . calling me all the names, 'dumb c - - t' and 'b - - - h' and just screaming and started screaming more and more." Tarra was "mortified" and said, "please don't do this in front of our baby." She started throwing the suitcases into the RV, but they got stuck and David "was hitting them to make them go in." He then "started walking towards me, and I started walking back really fast. My baby is not very good at walking back, so she's stumbling, and I was paying more attention to her than anything else." At that point her stepfather came through the side gate and "tried to intervene." David "deflated" "when he realized we weren't alone" and he "became his normal self."

Later that night, Tarra, David, and their daughter left in the RV and headed to Texas to visit Tarra's aunt. Early the next morning they had another argument. Tarra testified they were still in California at the time. She asked David about "the infidelity" again, and he "turned up the radio really loud." She turned it down, he turned it back up, and this happened "six or seven or eight times." When she turned it back down again he

hit her arm "really hard" and called her a "f - - - - - g c - - t." At that point, Tarra started recording the argument on her phone, and the recording and a transcript thereof were entered into evidence.[7]

Tarra's stepfather testified about the two incidents that occurred at his house on September 24. During the first incident, he was upstairs in the master bathroom and Tarra and David were in the doorway of Tarra's old bedroom. He heard "raised voices" and David's voice "escalating." He went to the door to the master bedroom and heard David call Tarra a "stupid f - - - - - - g c - - t." He testified David's "pitch had reached kind of a crescendo . . . and I thought this is bad." He exited his bedroom and saw David "starting to clench his fist and raise it as if to strike her." Tarra told her stepfather she and David were just having an argument. He told David to "knock it off," and then Tarra "kind of waved me off" and he went downstairs. He did not see the child during this argument.

The second incident occurred later that afternoon. Tarra's stepfather was in the side yard and David was in the front yard packing the RV. He heard Tarra ask David how she could help, and David said, "You worthless, stupid, lazy c - - t. You can't do anything." Tarra's stepfather came out to the driveway and saw David "clench his right hand and raise it above his head as if to strike her in the face, and she was backpedaling as fast as she could. [¶] She was, like, super scared, petrified, and he was yelling these vulgarities . . . and I thought I have to stop this. . . . So I simply said, 'Stop. Stop.' [¶] I

---

**7**     Although there was quite a bit of testimony about the recording, we do not describe either the testimony or the recording itself because the trial court ultimately found the incident in the RV did not occur in California, and even if it did, it did not constitute domestic violence. Tarra does not challenge either finding on appeal and she states she "will not rely on this incident as a basis for establishing personal jurisdiction over David."

think that sort of slowed the whole motion down. Tarra then backed into the house, and it kind of dissipated a little bit at that point."

David testified he lived in North Carolina and had never lived in California. After he met Tarra, they visited California three or four times for vacations and to visit her family. He disputed Tarra's version of the incidents at her parents' house on September 24. As to the first incident, he testified he and Tarra "did have an argument" while their daughter was asleep, but "there's no way I was yelling or screaming at her if my baby was asleep." "I was keeping my voice down because my daughter was asleep." When asked if he had used foul language, he responded, "We both use profanity in our arguments, but at that time, my daughter was asleep, I was trying to get Tarra to leave the room. I do not recall saying any of those words. It was one of those, 'Get away from me. Leave me alone' moments, and she would not leave me alone."[8] He acknowledged he had called Tarra names like "c - - t" and "lazy c - - t" in the past, but he did not do so "in that moment." He testified he did not physically threaten her in any way. He denied that the second incident happened. As to the third incident in the RV, he testified that they left Tarra's parents' house around 5:00 p.m., and the fight that Tarra recorded occurred around 6:45 a.m. the next morning as they were leaving Buckeye, Arizona. His version of events is that Tarra "dug her nails into my arm" and "pinched me multiple times, and I swatted her hand away from the radio."

At the conclusion of the hearing, the court granted the motion to quash and explained the basis for its ruling on the record. It began by noting, "this is clearly a dysfunctional relationship, but what I'm seeing here is a couple [who] lives in North

---

[8] David testified, "I call her names when she calls me names." Tarra acknowledged she has sometimes called him names and has "used foul language in [the] relationship." Tarra and David were also both in the military, and Tarra stated the military and her medical residency program could be "foul-mouthed places."

Carolina—mom lives in South Carolina at some point, but the family home is in North Carolina and they come to California to visit," and "maybe three inciden[ts] occur" in California. As to the incident that occurred upstairs at Tarra's parents' house, the court noted Tarra "said that [David] didn't touch her. He clenched his fist," and Tarra's stepfather "was concerned at the raised voices and what might happen. And then the incident outside, the same thing, although stepdad said that she was retreating." As for the incident in the RV, the court stated, "I don't think it happened in California," but assuming it did, "I don't see that as something that I would consider domestic violence" because it "was created completely by Tarra," who "started a fight," which then devolved into "mutual combat." After briefly summarizing some of what happened in North Carolina following David's arrest, the court emphasized, "I have got to look at the contacts he has with California." It then concluded, "I have two incidents, the fight in the bedroom and the fight just before they left. And I don't find either of those to be significant enough that I would consider granting any sort of restraining order with regard to that conduct. And in addition, she did nothing with that information until all the things happened in North Carolina. [¶] This is a North Carolina case, and California is not going to be an interloper. It is not our case. [¶] I'm going to grant the . . . motion and dismiss the restraining order."

That same day, the court issued a written order granting the motion to quash and dismissing the DVRO, and Tarra filed a timely notice of appeal.

### DISCUSSION

### I

### The Relevant Law

This case involves the application and interaction of three different bodies of law: (1) the law on personal jurisdiction and challenges thereto, (2) the law on domestic violence, and (3) the standard of review on a motion to quash for lack of personal jurisdiction.

8

## A.    *Personal jurisdiction*

California courts are authorized to exercise personal jurisdiction over a defendant "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.)  Constitutional limits on jurisdiction are "found in the due process clause." (*Doe v. Damron* (2021) 70 Cal.App.5th 684, 689 (*Damron*).)  "A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause . . . if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 (*Vons*).)  "As a matter of fairness, a defendant should not be 'haled into a jurisdiction solely as the result of "random," "fortuitous," or "attenuated" contacts' " with the forum state. (*Id*. at p. 445.)

Personal jurisdiction may be either general or specific, depending on "[t]he nature and strength" of the defendant's contacts with the state. (*Damron, supra*, 70 Cal.App.5th at p. 690.)  General jurisdiction exists if the defendant's "contacts in the forum state are 'substantial . . . continuous and systematic.' " (*Vons, supra*, 14 Cal.4th at p. 445.)  If general jurisdiction exists, "the court may exercise jurisdiction over the defendant regardless of whether the claims relate to the forum state." (*Damron*, at p. 690.)  "If a nonresident defendant does not have sufficient contacts in California to establish general jurisdiction, it may still be subject to the specific jurisdiction of our courts if there is a sufficient nexus among the defendant, the state and the litigation." (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 109 (*Automobile Antitrust Cases*).)  "To support specific jurisdiction, we look for a relationship between the defendant, the forum state, and the litigation.  [Citation.]  Specifically, (1) the defendant's own actions must connect him or her to the forum state [citation], and (2) the litigation must arise

9

from or relate to the defendant's actions." (*Damron*, at p. 691.) Here, we are concerned only with specific jurisdiction.

B. *The Domestic Violence Prevention Act*

Tarra seeks a DVRO pursuant to the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq.) "Under the DVPA, the trial court may issue an order 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782.) " 'Domestic violence' " is defined as "abuse" perpetrated against a spouse or former spouse (among other persons). (Fam. Code, § 6211, subd. (a).) "Abuse is not limited to the actual infliction of physical injury or assault" (Fam. Code, § 6203, subd. (b)), and includes (1) intentionally or recklessly causing or attempting to cause bodily injury; (2) placing a person in reasonable apprehension of imminent serious bodily injury; and (3) engaging in behavior that could be enjoined pursuant to Family Code section 6320. (Fam. Code, § 6203, subd (a)(1), (2), (4).) Behavior that may be enjoined pursuant to section 6320 includes "disturbing the peace of the other party." (Fam. Code, § 6320, subd. (a).) "[D]isturbing the peace of the other party" refers to "conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497.)

A nonresident defendant who commits domestic violence in California may be subject to the jurisdiction of California courts. In *Hogue v. Hogue* (2017) 16 Cal.App.5th 833 at page 839 (*Hogue*), for example, the court held a single act of domestic violence that occurred in or was directed at California can be "sufficient to vest personal jurisdiction in the courts of this state over defendant to enjoin any further such conduct," and we agree. (See also, e.g., *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 475, fn. 18 ["So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction"].) "California law protects people from domestic violence,

10

holds abusers to account, and provides a remedy for victims of spousal abuse that occurs in the state—without regard for whether the abusers or victims reside here. [Citations.] . . . [Citations.] Constitutional limits on jurisdiction do not grant a free pass to tourists and business travelers—millions of whom visit California each year—to abuse their spouses [in California] . . . without fear of civil liability in the state. California's interests weigh in favor of jurisdiction." (*Damron, supra*, 70 Cal.App.5th at p. 693.)

We thus agree with Tarra that if David were adjudged to have committed domestic violence as defined by the DVPA in California, California courts were entitled to exercise personal jurisdiction over him to enjoin such conduct.[9]

C. *Motion to quash for lack of jurisdiction*

A defendant may challenge jurisdiction by filing a motion to quash service of summons. (Code Civ. Proc., § 418.10, subd. (a)(1).) "The procedural rules that apply when a defendant moves to quash service of summons for lack of jurisdiction are . . . well settled. Although the defendant is the moving party, the plaintiff must carry the initial burden of demonstrating facts by a preponderance of evidence justifying the exercise of jurisdiction in California. [Citations.] The merits of the complaint are not at issue at this stage of proceedings. [Citation.] However, when personal jurisdiction is asserted on the basis of a nonresident defendant's alleged activities in this state, facts relevant to jurisdiction may also bear on the merits of the complaint." (*Automobile Antitrust Cases, supra*, 135 Cal.App.4th at p. 110.) "Once the plaintiff satisfies the initial burden of proof of showing a defendant's minimum contacts in California, the burden shifts to the

---

[9] David does not suggest otherwise, although he argues that even if Tarra established he had case-related contacts with California, he presented compelling evidence that the exercise of jurisdiction over him would be unreasonable or would violate " ' "traditional notions of fair play and substantial justice." ' " (*Vons, supra*, 14 Cal.4th at p. 444.) Given our conclusion in this case, we need not address this alternative argument.

defendant to present a compelling case demonstrating that the exercise of jurisdiction by our courts would be unreasonable." (*Id*. at pp. 110-111.)

"On undisputed facts, the issue of personal jurisdiction is a question of law subject to our de novo review; if there is a conflict in the evidence, we accept express or implicit factual resolutions of the trial court with substantial evidence in support." (*Hogue, supra*, 16 Cal.App.5th at p. 837; see also *Vons, supra*, 14 Cal.4th at p. 449 ["When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record"].)

II

Analysis

The parties largely agree on the law of personal jurisdiction and the definition of domestic violence. They also largely agree on the standard of review—at least in the abstract. They disagree on how the standard of review applies in this case. Tarra contends the two incidents that occurred at her parents' house constituted domestic violence within the meaning of the DVPA. She further contends the court "acknowledged" those two incidents "did, in fact occur" and they were "found true by the court," and the court thus should have found it had personal jurisdiction over David. The problem for Tarra is that the trial court did not find the incidents constituted domestic violence.

As David accurately notes, the evidence regarding those two incidents was "hotly disputed." He cites the rule that " '[w]hen evidence of jurisdiction is in dispute, we accept the trial court's resolution of factual issues, draw all reasonable inferences in support of the trial court's order, and review the trial court's determination of factual issues for substantial evidence.' " (*ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 210.) And again: "[I]f there is a conflict in the evidence, we accept express or implicit

12

factual resolutions of the trial court with substantial evidence in support." (*Hogue, supra*, 16 Cal.App.5th at p. 837.) He also notes the substantial evidence standard of review is deferential. Under this deferential standard of review, "findings of fact are liberally construed to support the judgment or order and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.] 'A single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.' " (*Powell v. Tagami* (2018) 26 Cal.App.5th 219, 231.) "And absent an express credibility finding, we must infer the trial court resolved questions of credibility in a manner that supports its findings and order." (*Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257.)

Because the evidence regarding the two alleged incidents of domestic violence was disputed, the deferential standard of review controls the outcome in this case. Regarding the first incident, Tarra testified David screamed at her, called her a "stupid, dumb c - - t," and "started coming towards" her, and on cross-examination she testified his fists were clenched, and her stepfather provided similar testimony. David acknowledged he and Tarra had an argument, but he testified he did not yell or scream, he did not use foul language, and he did not physically threaten her. Regarding the second incident, Tarra testified David started "screaming" at her, called her a "f - - - - - g lazy b - - - h" and a "dumb c - - t," and "started walking towards" her, and her stepfather added that David "clench[ed] his right hand and raise[d] it above his head as if to strike her" (we note Tarra did not testify David clenched his fist or raised it as if to strike her). David, in contrast, testified the second incident never happened.

Tarra asserts, "the trial court in this case found true that David had committed t[w]o acts of domestic violence against Tarra while visiting his in-laws in their house in . . . California." She then proceeds to parse the trial court's statements at the conclusion of the hearing to support her assertion. Any way you parse it, we do not agree that the

13

trial court found David committed two acts of domestic violence in California. Here, in its entirety, is what the trial court said about these two acts:

> "Now, incident one upstairs, [Tarra] . . . said that he didn't touch her. He clenched his fist. Stepdad was concerned at the raised voices and what might happen. And then the incident outside, same thing, although stepdad said she was retreating. . . . [¶] . . . [¶]

> "So this Court looks at, What do I have? I have two incidents, the fight in the bedroom and the fight just before they left. And I don't find either of those to be significant enough that I would consider granting any sort of restraining order with regard to that conduct."

Tarra argues if the trial court found the two incidents—or "fights"—did *not* constitute domestic violence, it would have said so, and the fact that it did not say so means it found the two incidents did constitute domestic violence. We believe the court did say so. In determining that neither of the two described incidents were significant enough to support the granting of a DVRO, the trial court resolved the factual disputes between David's and Tarra's testimony. The trial court appears to have credited David's testimony minimizing the conduct. David's testimony is thus substantial evidence supporting the trial court's finding that whatever occurred in California was not domestic violence. In light of this, the only asserted basis of jurisdiction over David does not exist.

Tarra cites *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379 at page 1384, for the proposition that "[w]hen the record clearly demonstrates what the trial court did, [an appellate court] will not presume it did something different." Here, however, the record does not clearly demonstrate the trial court found the two incidents constituted domestic violence.

We briefly address Tarra's argument that the trial court improperly considered the merits of the case rather than focusing solely on the facts relevant to jurisdiction. It is true, as Tarra notes, that "[t]he merits of the complaint are not at issue at this stage of

14

proceedings" (i.e., at the motion to quash stage). (*Automobile Antitrust Cases, supra*, 135 Cal.App.4th at p. 110; see also *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 540 ["a motion to quash for lack of personal jurisdiction does not implicate the merits of the complaint"].) It is also true, however, that "when personal jurisdiction is asserted on the basis of a nonresident defendant's alleged activities in this state, facts relevant to jurisdiction may also bear on the merits of the case." (*Automobile Antitrust Cases*, at p. 118; see also *Bader v. Avon Products, Inc.* (2020) 55 Cal.App.5th 186, 198 ["proof of jurisdictional facts may at times overlap with the merits"]; *Regents of University of New Mexico v. Superior Court* (1975) 52 Cal.App.3d 964, 970, fn. 7 ["when in personam jurisdiction is claimed on the basis of a foreign defendant's alleged forum-related activities in connection with the cause of action pleaded, facts relevant to the question of jurisdiction often bear upon the basic merits of the complaint"].)

Here, Tarra seeks a DVRO against David, and asserts California has jurisdiction over him because he committed two acts of domestic violence or abuse in the state. In order to obtain a DVRO, Tarra would have to "show[], to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Fam. Code, § 6300, subd. (a).) In order to show California has jurisdiction over David, she would have to show he committed an act or acts of domestic violence or abuse in the state. As Tarra describes it, the trial court "declared that it would limit the evidentiary hearing to the issue whether incidents of domestic violence had taken place within California for purposes of personal jurisdiction over David." That is precisely what the trial court declared. It confirmed that the hearing on the motion to quash would be "limited" to the issue of whether California had "personal jurisdiction" over David, and it stated, "I would need evidence of actual occurrences [of domestic violence] in California or something that happened outside of California that affected California. I don't want to hear anything other than that." Neither at the hearing nor in her appellate briefs does Tarra suggest the trial court

15

misstated the law.  As even Tarra thus implicitly acknowledges, this is a case where the facts relevant to jurisdiction overlap with the merits.

## DISPOSITION

The order granting the motion to quash and dismissing this case for lack of personal jurisdiction is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


/s/
EARL, P. J.

We concur:


/s/
MAURO, J.


/s/
DUARTE, J.


16